PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

v.

KIMBERLY WHITE,

   *Defendant-Appellant.*

No. 09-7933

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Dever III, District Judge.
(5:08-cr-00081-D-1)

Argued: May 12, 2010

Decided: September 22, 2010

Before NIEMEYER, DAVIS, and KEENAN, Circuit Judges.

---

Reversed by published opinion. Judge Davis wrote the majority opinion, in which Judge Keenan joined. Judge Keenan wrote a separate concurring opinion. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED**: Joseph Bart Gilbert, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Tobin Webb Lathan, OFFICE OF THE UNITED

STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Raleigh, North Carolina, for Appellant. George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

## OPINION

DAVIS, Circuit Judge:

Kimberly White ("White"), who suffers from Delusional Disorder, Grandiose Type, was indicted in the Eastern District of North Carolina on six counts of conspiracy, credit card fraud and identity theft. She filed an unopposed motion for determination of her mental competency to stand trial under 18 U.S.C. § 4241. The examining experts unanimously agreed, and it is undisputed, that White is not competent to stand trial. When White rebuffed all efforts to treat her disorder, on the government's motion, the district court held an evidentiary hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003), to determine whether the government would be permitted to forcibly medicate White for the purpose of rendering her competent to stand trial. *See id.* at 183 (stating that "the ultimate constitutionally required judgment" in such a case is whether "the Government [under prescribed criteria, has] shown a need for [forcible medication] sufficiently important to overcome the individual's protected interest in refusing it") (alterations added). Over White's objection, the district court granted the government's motion. White filed this timely interlocutory appeal, as permitted by *Sell*. *Id.* at 175-77.

We agree with the district court's finding that, as *Sell* requires, "*important* governmental interests are at stake" in

the prosecution of White. *Id.* at 180. Nevertheless, we are equally mindful that *Sell* commands us to "consider the facts of the individual case in evaluating the Government's interest in prosecution[,]" and to take account of whether "[s]pecial circumstances . . . lessen the importance of that interest." *Id.* For the reasons set forth herein, upon our *de novo* review of the asserted governmental interests and the "special circumstances" relevant to this case, we are persuaded that the order under review does not pass constitutional muster. The Supreme Court made clear in *Sell* that forced medication of an accused person in an effort to restore competency for trial is constitutionally permissible in "limited circumstances." *Id.* at 169. Because we are persuaded that the district court's order in this case comes perilously close to a forcible medication regime best described not as "limited," but as "routine," we reverse.

## I.

## A.

On March 19, 2008, White was indicted on six counts for the following crimes: (1) Conspiracy to Commit Credit Card Fraud, in violation of 18 U.S.C. § 371 (Count I); (2) Credit Card Fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (Counts II, III, and IV); and (3) Aggravated Identity Theft, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2 (Counts V and VI).[1] On June 6, 2007, the district court had appointed counsel

---

[1]The government summarized the factual underpinnings of the case to the district court as follows:

The defendant and a co-conspirator were arrested on March 14, 2007, in Raleigh, North Carolina for offenses involving Obtaining Property by False Pretenses and other property related charges. In the defendant's vehicle were found the following items: fourteen (14) gift cards from various retailers, eleven (11) credit cards; six (6) Sam's Club identification cards with different names but all bearing the defendant's picture; and four (4) driv-

to represent White and, after the return of the indictment, that is, on April 2, 2008, the court ordered White detained until trial.**²** White's counsel subsequently filed, and the district court granted, an unopposed motion to determine her competency. Thereafter, on or about April 29, 2008, White arrived at the Federal Medical Center at Carswell, Texas ("FMCC") where she underwent a preliminary psychological evaluation. In a June 23, 2008 report, doctors diagnosed her with Delusional Disorder, Grandiose Type, and found her not competent to stand trial. In light of the competency evaluation findings, the district court, on July 22, 2008, ordered White committed to determine the probability of restoring her competency pursuant to 18 U.S.C. § 4241(d).

B.

While White was committed to FMCC, she was evaluated by Drs. Robert Gregg and Leslie Powers. The doctors reported the following to the district court in their submission of December 5, 2008:

White was consistently uncooperative with the efforts of FMCC's clinical staff to evaluate her. Upon arrival, clinical staff attempted to admit her into the mental inpatient unit, the

---

er's licenses with different names but all bearing the defendant's picture. The names on the documentation were for actual people who had no idea their names were being used in this fraudulent scheme.

*See* Memorandum in Support by USA as to Kimberly White re: Motion to Schedule Sell Hearing (Unopposed) at 1-2, No. 5:08-CR-00081 (E.D.N.C. May 29, 2009).

**²**In fact, White had been detained in state custody on parallel state charges since her March 14, 2007 arrest. The federal district court's appointment of counsel to represent White on June 6, 2007, more than nine months before she was indicted federally, apparently is explained by the fact that her case drew both state and federal interest not long after her arrest.

M1 unit, which is used for defendants undergoing forensic evaluations. White refused to sign admission papers or to participate in an interview to collect her psychological and medical history. In light of her behavior, White was moved to unit M3, the psychiatric observation unit. While there, White created a concoction from her food that she insisted was the cure for AIDS, and therefore, she refused to return some of her food after meals, causing the stench of rotten food to permeate the unit. Because she was afraid that someone would steal her "antidote" for AIDS if she left her cell, White generally refused to leave her cell to take showers or to permit staff to clean her cell. White wrote notes all over her cell regarding her alleged cure for AIDS and her desire to obtain a patent for her invention. When FMCC staff took away her writing implements, White began writing notes on her walls with the same content in blood. Due to her actions and the stench of her unit, the staff at FMCC assembled a team to forcibly remove her from her cell; however, just before the team went into her cell, she voluntarily agreed to leave.

On September 10, 2008, the staff at FMCC made a second attempt to admit White to Unit M1 but, due to her disruptive behavior, they quickly returned her to the psychiatric observation unit. She remained there for the duration of her observation period, refusing to submit to an evaluation, refusing to answer questions regarding auditory or visual hallucinations, and refusing to consider taking any psychotropic medications.

Despite the lack of a thorough medical examination, the staff confirmed White's diagnosis of Delusional Disorder, Grandiose Type. In short, White believes that she has found a cure for AIDS and breast cancer. Drs. Gregg and Powers noted in their report that White's symptomology is atypical because she has no history of psychotic symptoms, she possesses an ability to modulate her symptoms in different situations, and her behavior is often contrived and volitional, particularly with regards to her defiance and aggression towards authority.

The evaluators concluded that White's mental illness rendered her incompetent to stand trial. Believing psychotropic medication to be the only method by which White could be restored to competency, the evaluators concluded that "forcibly medicating Ms. White [was the] only viable treatment option." J.A. 156. In addressing the criteria for forced medication under *Sell*, they further opined that: (1) "psychotropic medication is a medically appropriate treatment for White's illness"; (2) "medication can be prescribed which will be substantially unlikely to have side-effects which would undermine the trial's fairness"; and (3) "no less-intrusive alternatives exist which will effectively treat White's mental illness." *Id.*

C.

On January 2, 2009, the government moved for an evidentiary hearing in order to elicit further information as to White's mental condition and the appropriateness of forced medication in light of *Sell*. The district court held a *Sell* hearing on May 21, 2009 to determine whether the government could forcibly medicate White in order to restore her competency. Dr. Powers and Dr. Kempke testified in support of the government's motion.[3]

Dr. Powers testified that she first "examined" White in April 2008 when White was admitted to FMCC. She testified that although she observed White, she did not personally administer any tests to White, so her study was based solely on her observations, staff observations, and collateral data. She opined that White suffers from Delusional Disorder, Grandiose Type and that her disorder rendered her incompetent to stand trial. She also opined that White does not meet the statutory requirements for civil commitment.

---

[3]The district court accepted Dr. Powers as an expert in clinical and forensic psychology and Dr. Kempke as an expert in psychiatry.

As to treatment, Dr. Powers testified that she had recommended a non-medical course of action for White, namely, competency restoration classes, but that White refused to participate in the classes. Dr. Powers then found that efforts to treat White's disorder and render her competent through non-medical treatment were exhausted. She also explained that White refuses voluntarily to take medication for her disorder and reiterated that because White presents no danger to herself or to others, forcible medication is not justified on such grounds.

Dr. Powers testified that she was uncertain how White would react to forcible medication. She explained that few studies exist about restoring individuals with delusional disorder to competency for the purposes of trial, and that the principal study, the Herbel study, provided her with insufficient insight as to what would happen to White. She further testified that if White were forcibly medicated, side effects could potentially occur during trial and could interfere with her attorney's ability to present White to her jury.

Dr. Kempke, White's treating psychiatrist, who also testified, agreed with Dr. Powers' diagnosis of White. In making her diagnosis, Dr. Kempke, like Dr. Powers, did not physically examine White. Nor did she review White's medical records or contact her family to obtain her family's medical records. Instead, Dr. Kempke relied on Dr. Powers' review of White's records. J.A. 62-64.

Dr. Kempke concluded that forcible medication was appropriate and the bulk of her testimony focused on explaining the various medications. She testified that White could be treated with antipsychotic medications, either first-generation or so-called typical drugs, or second-generation or so-called atypical drugs. Because White refused to take antipsychotic medication orally, Dr. Kempke would be limited to using injectable medications, namely Haldol Deconoate and Prolixin Decanoate or Enanthate (first-generation medica-

tions), and Rispirdal Consta (a second-generation medication).

Dr. Kempke explained the administrative procedure that would be followed for medicating White. First, staff would request White to voluntarily accept the medication by backing up to and receiving the injection through the "bean slot." If White refused, the staff would attempt to persuade her to cooperate. If such efforts failed, White would be forcibly medicated. Upon the warden's approval and under videocamera, a crew of five staff members would don protective gear consisting of a cover-all, a vest, and a helmet, and immobilize White. After the force team secured White's arms and legs in restraints, the treatment team would enter and collect labs (if necessary), medicate White, and then evaluate her for injuries. This process would then be repeated as necessary, likely in two-week intervals leading up to and throughout trial.

Dr. Kempke explained the dosage regimen and potential side effects of the anti-psychotics that she would recommend for White. The first-generation antipsychotics have a substantial risk of tardive dyskinesia, a disorder that involves involuntary movements, especially of the lower face, and that can result in irreversible trembling effects that resemble what can be seen in patients with Parkinson's disease. Tardive dyskinesia "is felt to occur at an accumulative rate of 5% . . . per year, getting to a maximum of 60% of individuals . . . after approximately 20 years of delivering them." J.A. 50. Shorter-acting symptoms include shuffling gait, and muscle twitches or spasms; such symptoms may be controlled by an anticholinergic drug such as Benztropine or Benadryl. The first-generation medications also include a risk of neuroleptic malignant syndrome, a "very rare and potentially fatal loss of control of the body's ability to maintain thermal homeostasis due to excessive dopamine stimulation." J.A. 51, 158. Instability in movement is also a potential side effect, as is agranulocytis, which is "quite rare" but can be fatal. J.A. 158.

According to Dr. Kempke, second-generation medications also harbor the potential side effects of tardive dyskinesia and extrapyramidal symptoms, although the risk is diminished. Second-generation drugs, however, impose an additional risk of Metabolic Syndrome. Metabolic Syndrome "can be characterized by elevated body weight, increased risk of diabetes, increased risk of hyper-lipimedia, which is elevated triglycerides and cholesterol, and therefore increasing the risk of cardiovascular diseases due to the diabetes, weight gain, and lipid problems associated with that." J.A. 53-54. In a letter submitted to the district court, Dr. Kempke also identified some less serious effects of antipsychotics such as muscle stiffness, weight gain, lowering of seizure threshold, and elevated prolactin, which could cause enlarged breasts or inappropriate lactation.

Dr. Kempke testified that some of the side effects of second-generation drugs cannot be treated with other medication. Instead, medical professionals cease administering the drug to decrease the risk of lipids and elevated blood sugars. She noted that this has become a "significant difficulty in psychiatry" because medical professionals are forced to choose between the risk of tardive dyskinesia, which is irreversible, unpleasant, and disfiguring, on one hand, and, on the other hand, an increased risk of cardiac disease and diabetes.

Overall, Dr. Kempke testified that the required antipsychotic drugs are considered relatively safe and have been used to treat millions of schizophrenic and psychotic individuals with major benefits and relatively minor risks of serious side effects.[4] She described most of the side effects as rare, and in her experience, Dr. Kempke has "never encountered a

---

[4]Only .03% of psychotic individuals suffer from Delusional Disorder, Grandiose Type. Dr. Kempke has never personally treated any patient with that type of disease with antipsychotic medicines. Her opinion is based on the treatment of patients with other types of psychotic disorders, mostly schizophrenia.

side effect that endangered the fairness of a trial." J.A. 159. Thus, she opined that forcibly medicating White would be substantially likely to render her competent to stand trial and substantially unlikely to have side effects that would interfere significantly with White's ability to assist counsel in conducting a trial defense. She estimated that White would be restored to competency a couple of weeks after receiving her first long-acting injection of a first-generation drug and within four weeks if given a second-generation drug. She acknowledged, however, that it could take as long as five months for White's competence to be restored, and that it is possible that she would never be restored to competence.

D.

On October 9, 2009, the district court granted the government's motion to medicate White forcibly. The court found that the government satisfied its burden, by clear and convincing evidence, as to each of the *Sell* factors. The district court ordered FMC Carswell to forcibly medicate White pursuant to its proposed plan with the additional requirement that all medical personnel treating White first request that she voluntarily take the medication.

The district court stayed its order, anticipating an appeal by White. White filed a timely notice of appeal and before us, she challenges the district court's findings and conclusions as to the first, second, and fourth prongs of the *Sell* analysis. This court has jurisdiction to review the order authorizing forced medication pursuant to 28 U.S.C. § 1291 and the collateral order exception. *Sell*, 529 U.S. at 175-77.

II.

Individuals have a "'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs[,]'" *id.* at 178 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990)) which may only be over-

come by an "essential" or "overriding" state interest. *Id.* at 179 (quoting *Riggins v. Nevada*, 504 U.S. 127, 134, 135 (1992)). "[W]hen the purpose or effect of forced drugging is to alter the will and the mind of the subject, it constitutes a deprivation of liberty in the most literal and fundamental sense." *United States v. Bush*, 585 F.3d 806, 813 (4th Cir. 2009) (applying *Sell* and vacating district court's order permitting forced medication of defendant charged with threatening a federal judge and remanding for further proceedings) (quoting *Harper*, 494 U.S. at 237-38 (Stevens, J., dissenting)); *see also United States v. Evans*, 404 F.3d 227, 235 (4th Cir. 2005) (applying *Sell*, vacating district court's order permitting forcible medication of defendant charged with threatening to kill a federal judge, and remanding for further proceedings), *op. on remand*, 427 F. Supp. 2d 696 (W.D. Va. 2006) (ordering involuntary medication), *aff'd*, No. 06-4480, 2006 WL 2604843 at *1 (4th Cir. Sept. 12, 2006), *cert. denied*, 549 U.S. 1186 (2007). We have observed that "the government's ability to enforce the criminal laws in accordance with due process is the foundation on which social order rests and from which individual liberties emanate." *Bush*, 585 F.3d at 813. Consequently, when an individual is alleged to have committed a serious crime and the criteria mandated by *Sell* are satisfied, she forfeits her liberty interest to be free from forced medication to the extent necessary for the government to bring her to trial.[5] *Id.*

The Supreme Court has recognized the tension between the government's interests and the special deprivation of liberty sometimes imposed on individuals with mental illness, and it

---

[5]In *Bush*, we stated that, "when an individual commits a crime, he forfeits his liberty interests to the extent necessary for the government to bring him to trial." 585 F.3d at 813. It is obvious, however, as *Evans*, *Bush*, and this case all demonstrate, that since the very purpose of a trial is to determine *whether* "an individual [has committed] a crime," it is not the *commission* of a crime that works a forfeiture of the individual's liberty interest in the context of forcible medication to restore competency, but rather, a formal *allegation* that an individual has committed a crime.

has held that, in what it seemingly contemplated would be "rare" instances, *Sell*, 539 U.S. at 180, a federal court may constitutionally authorize the government to administer antipsychotic medication involuntarily and by force for the purpose of rendering a defendant competent to stand trial.[6] *Id.* To establish the propriety of so doing, the government must establish each element of a four-factor test by clear and convincing evidence. *Bush*, 585 F.3d at 814. First, the government must show that "*important* governmental interests are at stake" and that special circumstances do not sufficiently mitigate those interests. *Sell*, 539 U.S. at 180. Second, involuntary medication must significantly further the government's interests by making it "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel" at trial. *Id.* at 181. Third, the involuntary medication must be necessary to further the government's interests, and less intrusive means must be unlikely to achieve substantially the same results. *Id.* And last, the court must conclude that the administration of drugs is medically appropriate and in the patient's best medical interests in light of her medical condition. *Id.*

The first factor involves a legal determination and thus we review the district court's determination of that factor *de novo*. *Evans*, 404 F.3d at 236 (citing *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004)). We review any factual findings relevant to this legal determination for clear error. *Id.* The remaining three factors present factual questions subject to clear error review. *Id.* (citing *United States v. Holmes*, 376 F.3d 270, 273 (4th Cir. 2004)).

---

[6]The proper test to determine whether the government may involuntarily medicate an individual depends on the governmental purpose for the medication. *See Evans*, 404 F.3d at 235 n.3. Here, it is undisputed that *Sell* provides the appropriate legal framework.

## III.

The crux of this case is whether the government has a sufficiently important interest in prosecuting White such that interference by forced medication with her constitutionally protected liberty interest is justified, as measured against the presence of any special circumstances militating against recognition of asserted important governmental interests in bringing her to trial. *Sell*, 539 U.S. at 180. We conclude that the special circumstances present in this case reduce the government's interest in prosecuting White to the point that infringement on her constitutionally protected liberty interest in freedom from forcible medication cannot be sustained.

## A.

The crimes here, though nonviolent, are serious. Without establishing a hard and fast rule, we have held that a crime is "serious" for involuntary medication purposes where the defendant faced a ten-year maximum sentence for the charges against him.[7] *Evans*, 404 F.3d at 238 (concluding that a

---

[7]In contrast to our preference of looking to the statutorily-authorized maximum sentence in determining whether a crime is "serious," *see Evans*, 404 F.3d at 237-38, other circuits have not expressed such a preference but have recognized that the federal sentencing guidelines also provide a reasonable metric by which the seriousness determination may be made. *See United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th Cir. 2007) (reasoning that "[w]hether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged," and analyzing seriousness in light of the statutory maximum as well as the likely guideline sentence); *Gomes*, 387 F.3d at 160 (describing "the seriousness of the crime and [the defendant's] perceived dangerousness to society [as] evident from the substantial sentence [the defendant] faces if convicted"), *see also Developments in the Law—The Law of Mental Illness:* Sell v. United States: *Forcibly Medicating the Mentally Ill to Stand Trial*, 121 Harv. L. Rev. 1121, 1127 (2008) [hereinafter *Developments in Mental Illness Law*] ("While the sentence length is a reasonable consideration for determining whether a defendant-protective right should apply, it is a less useful signal

charge of "threatening to murder a federal judge under § 115(a)(1)(B), a felony whose maximum term of imprisonment is 10 years-is 'serious' under any reasonable standard"); *see also Bush*, 585 F.3d at 814 (citing *Evans*, 404 F.3d at 238 and concluding the same). Here, White was charged with crimes that involve a maximum statutory penalty of over ten years. If convicted, she faces a maximum penalty of five years imprisonment on Count I, 18 U.S.C. § 371; ten years each for Counts II, III, and IV, 18 U.S.C. §§ 1029(a)(2), (c)(1)(A)(i); and two years for Counts V and VI. 18 U.S.C. §§ 1028A(b)(2) & (b)(4). Accordingly, under our precedent, White is charged with "serious" crimes.

## B.

But the government's interest in prosecuting those charged with serious crimes can be mitigated by special circumstances. *Sell*, 539 U.S. at 180 (providing an illustrative list of special circumstances that potentially lessen the government's interest in prosecuting an otherwise serious crime).[8] We

---

of whether there is a serious state interest in seeing a defendant brought to trial. Even when the defendant faces little or no jail time, the state may still have an important interest in bringing him to trial, for instance in symbolic prosecutions of high-profile defendants.").

In any event, we have not flatly rejected consideration of the likely guideline sentence in an appropriate case. *E.g.*, *Bush*, 585 F.3d at 814 ("First, even though each count of the indictment charging her with a crime carries a maximum 10-year sentence, the Sentencing Guidelines, the government's concessions, and the district court's observations indicate that if Bush were found guilty, she would likely be sentenced to only time served.").

[8]As summarized in *Bush*:

Special circumstances include (1) the possibility that the defendant might be confined to an institution for the mentally ill, thus "diminish[-ing] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime"; (2) the potential for future confinement should the defendant regain

examined the issue of "lessened interest" arising from "special circumstances" in both *Evans* and *Bush*. In *Evans*, we agreed with the district court that even though the defendant had been in custody for more than two years, and even though there existed a possibility of a civil commitment, the government's interests were not significantly lessened. *Evans*, 404 F.3d at 239-40. Similarly, in *Bush*, we considered but rejected as unpersuasive under the circumstances of that case, Bush's arguments that (1) her lengthy period of pretrial detention (a substantial portion of which was on home confinement rather than in an institution) exceeded her likely sentence upon conviction and (2) the likelihood (based on a *mens rea* type defense) that the government would be unable to prove her guilt beyond a reasonable doubt. *Bush*, 585 F.3d at 814-15. Both of those cases, each involving a defendant who had allegedly threatened the life of a federal judge (and in *Evans*, one who had also allegedly assaulted a federal employee), provide guidance to us here but do not control the outcome of our fact-intensive inquiry into the special circumstances of this case.

## C.

In finding the absence of any special circumstances, the district court's order was quite brief. The court stated:

> As for whether any special circumstances undermine the government's interest, White has been in custody for approximately eighteen months. The par-

---

competence; and (3) the fact that "the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Id.* at 180, 123 S.Ct. 2174 (citation omitted).

*Bush*, 585 F.3d at 815 (citing *Sell*). As we discuss in text, we can discern no basis for believing that in fashioning this short list, the *Sell* Court intended that lower courts treat it as having exhausted all possible "special circumstances."

ties agree that she would not be an appropriate can-
didate for civil commitment. Thus, if White is not
rendered competent to stand trial, she likely would
be released, and the government would surrender its
opportunity to prosecute her. Accordingly, no special
circumstances undermine the government's interest,
and the court finds that the government meets the
first prong under *Sell*.

J.A. 141-42. It should be noted that, although the district court
stated that White had been in custody "approximately eigh-
teen months," at the time of the court's October 2009 order,
White had actually been in custody for more than 29 months,
i.e., since March 2007. This is undisputed, as the government
conceded at oral argument before us that White will be enti-
tled to credit against any federal sentence for all the time she
spent in state custody before her custody was assumed by the
federal authorities.

The government argues that special circumstances do not
undermine its important interest in prosecuting White. It
focuses on two factors: "(1) the potential for a lengthy con-
finement in the future if a mentally ill defendant is subject to
civil commitment, and (2) the possibility that a mentally ill
defendant has been confined for a significant period of time."
Appellee's Br. at 22 (citing *Sell*, 539 U.S. at 180). The gov-
ernment argues that these factors are inapplicable here as mit-
igating circumstances: the former is inapt because White
undisputedly does not qualify for civil commitment, and the
latter because the time White has already served, even if it is
equivalent to the sentence she may reasonably anticipate to
receive if convicted, is alone insufficient to defeat the govern-
ment's interest.

## D.

We reject the government's implied assertion that our spe-
cial circumstances analysis is limited to considering whether

White is subject to civil commitment and whether she has been confined for a significant period of time. In *Sell*, the Supreme Court clearly stated that the inquiry is a fact-specific one: "[c]ourts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. The Court then provided a non-exclusive list, as evidenced by its use of the term "for example" in the sentence immediately following its announcement that special circumstances may lessen the government's interest. *Id.* Further, we have already recognized the flexible nature of our special circumstances inquiry in *Evans*, where we explicitly stated that length of incarceration is not necessarily the only factor relevant to whether special circumstances undermine the government's interest. We reasoned as follows:

> By focusing on the amount of time with which Evans would be credited under [18 U.S.C. §] 3585(b), we do not imply that time is the only consideration relevant to whether special circumstances undermine the government's interest. There may be purposes of criminal punishment unrelated to the actual length of incarceration that would continue to give the government an important interest in trying a defendant accused of a serious crime even if the time he spends in pre-trail [sic] detention approaches the statutory maximum penalty for the crime with which he is charged. *See Sell*, 123 S. Ct. at 2184 (noting that the defendant's pre-trial confinement "affects, but does not totally undermine, the strength of the need for prosecution."). Because we conclude that the Government continues to have an important interest in trying Evans based on the potential length of his incarceration alone, we need not consider this more difficult issue here.

*Evans*, 404 F.3d at 240 n.9. Thus, as we acknowledged in *Evans*, the flexibility of the special circumstances determination may identify factors militating in favor of the government's interest in going forward with a prosecution even where there has been prolonged pretrial detention, and the analysis may also identify factors further undermining the government's interest. We continued this analysis in *Bush*, 585 F.3d at 815,[9] where we mentioned the possibility that, if a conviction were obtained, the district court would have the option of imposing a period of supervised release as a factor bolstering the government's interest.[10]

## E.

Upon our mature consideration of the case before us, we are persuaded that special circumstances so undermine the government's interests in this case that governmental deprivation of White's constitutionally protected liberty interest in refusing medications cannot be justified. We consider, first, the amount of time that the defendant has spent (and will likely spend) in confinement before her trial could even begin, as the length of time could undermine the government's interests in protecting the public, in general and specific deter-

---

[9]In *Bush*, we also explained that "the very fact that the government is prosecuting Bush for this conduct conveys a message about its seriousness and its consequences." 585 F.3d at 815. Although this is true, it is *not* a unique characteristic in this case, nor could it ever be a unique characteristic of any case of this type. It is instead a truism, applicable to *any* case where the government seeks forcible medication: without a prosecution, there would be no case.

[10]*Cf. Developments in Mental Illness Law*, 121 Harv. L. Rev. at 1128 (criticizing the special circumstances inquiry used by lower federal courts and urging courts to better fulfill the mandate of *Sell* by evaluating the "harm the indictment alleges a defendant caused or could have caused[,]" "the potential Guidelines sentencing range a defendant would face[,]" and "other benefits of prosecution besides the potential incapacitation of the defendant, including the retributive, deterrent, communicative, and investigative functions of the criminal justice system.") (internal citations omitted).

rence, and in obtaining just punishment. *Sell*, 539 U.S. at 180. Second, the nature of the crime deserves consideration; unlike the circumstances in *Evans* and in *Bush*, White's alleged crimes, though certainly serious, are entirely non-violent. Third, we note that the district court's order committing White to a Bureau of Prisons mental hospital precludes her from certain activities, such as her ability to obtain and own firearms, and so a conviction is unnecessary insofar as it would safeguard the public from any possible acts of gun violence from her. Fourth, we must review White's unique medical condition because the drugs proposed by the government have rarely, if ever, been tested on individuals with White's condition and this ambiguity might undermine the government's interest in a fair trial. Fifth and finally, we should ensure that this case is sufficiently exceptional to warrant the extraordinary measure of forcible medication.

### 1.

The government's interest in prosecution is lessened when "the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b))." *Sell*, 539 U.S. at 180. The operative word here is "significant." To determine if White has been in custody "a significant amount of time" as compared to her likely sentence, we must calculate White's time served, her likely sentence, and then ask whether the former is significant in light of the latter. *See Evans*, 404 F.3d at 239-40. Because White will likely be entitled to credit for having served a period of approximately 57.7 months by the time she is tried, and if convicted, will be unlikely to be sentenced to more than 42-51 months, we find that White has been confined for "a significant amount of time" in light of her likely sentence.

### a.

A defendant shall be given credit toward the service of a term of imprisonment for any time she has spent in official

detention prior to the date the sentence commences, as long as it was served for the same offense and has not already been credited. 18 U.S.C. § 3585(b)(2). White was arrested on March 14, 2007, and has been detained at FMCC since April 2008. Thus, as of August 2010, White will have been incarcerated for approximately 41 months.

Assuming that we affirm the decision of the district court, however, White will still be required to serve time beyond the 41 months for medical reasons. Her doctors estimate that White could require up to five months to become competent to stand trial. The district court recognized that White would need several months to become competent to stand trial, permitting White's commitment "for a period of four months, or a lesser period if reasonably sufficient to restore her to competency." J.A. 144. Based on this finding, we estimate that the authorities would detain White for approximately four additional months for the purposes of establishing her competency.

White will be also required to endure additional detention for legal reasons if she wishes to exhaust her appellate rights.[11] The district court contemplated at least some of these appeals when it stayed its order. Again, assuming that we affirm the decision of the district court, White would be entitled to move for en banc rehearing by this court and to file a petition for *certiorari* to the Supreme Court. These proceedings could persist for many months, however, and even assuming quick and consistent denials, such proceedings would cause White

---

[11]The record before us reflects that White is not communicating with her attorney; indeed, she refused to attend or to participate in the *Sell* hearing conducted by the district court through the use of video conferencing technology. Although her attorney was in Texas at the prison hospital, she refused to meet with him. Consequently, just as counsel has vigorously pursued the appeal to this court on behalf of his mentally ill client, we would expect his vigorous representation to continue through further appellate review.

to remain detained for at least an additional six months.[12] Adding these additional 10 months to White's 41 yields a total of 51 months.

Moreover, if White were ultimately tried and convicted, and then sentenced to a term of imprisonment, she would be entitled to good time credits for each year that she has served, shortening her overall time actually served. "Federal sentencing law permits . . . authorities to award prisoners credit against prison time as a reward for good behavior." *Barber v. Thomas*, 130 S. Ct. 2499, 2502 (2010) (citing 18 U.S.C. § 3624(b)). The Bureau of Prisons determines good time credits based on each year that a defendant actually serves. *Id.* at 2502-03 (holding lawful the Bureau of Prisons' method for calculating good time credit based on time served instead of the length of the sentence imposed). Under *Barber*, White would be entitled to approximately 201 days of good time credits, or 6.7 months.[13] This increases White's time served from 51 months to a total of 57.7 months of time (deemed) served.

b.

Next, we must consider White's likely prison sentence. The district court, using the statutory mandatory minimum (as to

[12]Our en banc petitioning process would require approximately 24 days. Fed. R. App. P. 40; Loc. R. 26(a). Then White could file her petition for certiorari anytime within 90 days of the final ruling on the Fourth Circuit, and if the Government wanted to file a reply, the process would take an additional 30 days. Sup. Ct. R. 13(1), 15(3). Thus, if the Supreme Court denied her petition in less than five weeks, White's legal remedies would be entirely exhausted in approximately six months.

[13]In *Barber*, 130 S. Ct. at 2502-03, the Supreme Court used a mathematical calculation that reached "approximately the same results as, and [is] essentially the mathematical equivalent of" the system used by the Bureau of Prisons. Applying that calculation to White's 51 months (or 1550 days) of "time served" indicates that White would have earned 205 days or 6.7 months of good time credits if she had served that time in prison.

the aggravated identify theft charges) and statutory maximums for each crime, found that White could receive a sentence between four and 39 years if convicted. The court did not explicitly determine White's likely sentence, however, instead concluding, without explanation, that White's eighteen months of custody, which was actually 29 months of custody, *see supra* Part III.C, did not comprise a special circumstance. We require more.

In the exercise of our duty to conduct a *de novo* review in this case, we think it is appropriate to undertake a more comprehensive analysis. We may reliably consider White's likely sentence, either by taking judicial notice of the average sentences imposed for the charged crimes on a national or local level, by reviewing the sentences of co-defendants charged with substantially similar crimes, or by actually calculating the defendant's likely sentence vis-a-vis the advisory sentencing guidelines. This is what we impliedly stated in *Bush* when we considered the defendant's likely sentencing guidelines:

> Thus, even though each count of the indictment charging [defendant Bush] with a crime carries a maximum 10-year sentence, the Sentencing Guidelines, the government's concessions, and the district court's observations indicate that if Bush were found guilty, she would likely be sentenced to only time served. Without recognizing Bush's possible acceptance of responsibility, the Sentencing Guidelines call for a sentence of 24 to 30 months' imprisonment.

*Bush*, 585 F.3d at 814. If the court is unable to determine the appropriate sentencing guidelines, as we did in *Bush*, then it may consider relevant national and local data and similarly situated defendants to promote uniformity in sentencing. 18 U.S.C. § 3553(a)(6) ("The court, in determining the particular sentence to be imposed, shall consider . . . (6) the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct.").

In undertaking our analysis, we first turn to the sentence imposed on White's co-defendant, Vonda Machelle Baker.[14] Baker waived indictment and pled guilty on or about December 3, 2007 to a three-count criminal information in the United States District Court in the Eastern District of North Carolina. Memorandum of Plea Agreement, at 1, 5:07-cr-321-1-D (E.D.N.C. Dec. 3, 2007). She pled guilty to one count of conspiracy to commit identity fraud under 18 U.S.C. § 1028(f) and two counts of aggravated identity theft under 18 U.S.C. § 1028A(a)(1). Baker's advisory guidelines sentencing range was projected to be 39 to 45 months (15 to 21 months on the conspiracy count and 24 months consecutive on the aggravated identity counts). *See* Government's Motion for Downward Departure due to Substantial Assistance, at 2, 5:07-cr-321-1-D (E.D.N.C. June 3, 2008). In consideration of her substantial assistance to the government (against White, among others) the government filed a motion on June 3, 2008, for a sentencing departure pursuant to U.S.S.G. § 5K1.1, recommending a sentence of 27 months.[15] *Id.* On June 11, 2008,

---

[14]In our consideration of the proceedings against White's co-defendant, Vonda Baker, we take judicial notice of the contents of the record in *United States v. Baker*, No. 5:07-cr-321-1-D (E.D.N.C. 2007). *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (citing cases for the premise that federal courts may take notice of proceedings in other courts if those proceedings have a direct relation to matters at issue).

[15]Counsel for Baker stated the following in his memorandum in aid of sentencing filed on Baker's behalf:

Upon their arrival in North Carolina [from Atlanta, Georgia], Ms. Baker and Ms. White met with Ms. White's acquaintances. At various times, Ms. Baker and Ms. White would go out with other individuals and Ms. White would make fraudulent transactions. *Upon information and belief, the other individuals would take custody of the majority of the property and Ms. White would receive some lesser payment for her participation.* Ms. Baker did

the district court sentenced Baker to serve 36 months in prison (12 months on the conspiracy count and 24 months, to be served concurrently to each other and consecutively to the count one sentence, for each of the two counts of aggravated identity theft) for substantially the same relevant conduct in which White is alleged to have engaged. She was released from the Bureau of Prisons on October 29, 2009. *See* Bureau of Prisons Locator, http://www.bop.gov/iloc2/ LocateInmate.jsp (search "Vonda Machelle Baker"). Baker's three-year sentence provides a useful data point for our analysis.[16]

We next review the median and mean sentences imposed for White's charged crimes on a local and national level. These data are appropriate for judicial notice as they are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Ev. 201 (b), *see also id.* (c) & (f). The dataset is simply a compilation of information available in the public record. *E.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of public records).[17] This analysis will focus on Counts I-IV, the fraud offenses, as it is undisputed that White would receive a sentence of 24 months for each Count if she was convicted of Counts V and VI, the aggravated identity theft offenses.

---

not directly receive any of the proceeds from the fraudulent purchases. However, Ms. Baker did stay in hotel rooms and did use cocaine that was presumably paid for with the fraudulent activities.

*See* Sentencing Memorandum, at 1-2, 5:07-cr-321-1-D (E.D.N.C. Dec. 3, 2007) (emphasis added).

[16]Of course, the analogy is imperfect; Baker pled guilty to only three counts (White is charged in six) and, unlike White, Baker provided substantial assistance to law enforcement.

[17]*See also supra* note 14.

The statistics on fraud offenses suggest that White has a genuine chance of avoiding any prison sentence on the fraud counts, even if convicted. Nationally and within the Fourth Circuit, many defendants convicted of fraud offenses receive no prison time. Nationally, in 2009, of the 7,583 defendants sentenced for fraud crimes, over *20%* received a sentence of either probation and confinement or of only probation.[18] And of those defendants eligible for non-prison alternatives, 46.4% received a non-prison sentence.[19] In the Fourth Circuit, the statistics tilt towards non-prison sentences even more. Of the 768 defendants convicted of fraud crimes, nearly 25% received a sentence of only probation or of probation and confinement,[20] and defendants eligible for non-prison sentences receive them a majority of the time.[21] Thus, even if convicted of Counts I-IV, there is a 20-25% probability, between a 1-in-4 and 1-in-5 chance, that White would receive little or no sentence for the fraud counts.

Assuming that White is convicted and sentenced for the fraud counts, she would likely receive a relatively short sentence for each count. Data compiled by the United States Sentencing Commission is instructive on this point. On the national level, defendants convicted of fraud charges receive a mean sentence of 28.5 months and a median sentence of 18

[18]To be precise, 77.8% received a prison sentence or a sentence split between prison and community, while 22.2% received a sentence of either probation and confinement only or only probation. U.S. Sentencing Commission, Statistical Information Packet for Fiscal Year 2009 for the Fourth Circuit [hereinafter Sentencing Commission Statistics], *http://www.ussc.gov/judpack/2009/4c09.pdf* at 7.

[19]*Id.* at 9.

[20]In the Fourth Circuit, 24.5% of defendants convicted of fraud received a sentence of only probation or of probation and confinement while 75.5% received a sentence that included a prison term. *Id.* at 8.

[21]*Id.* at 9 (providing the statistic that in the Fourth Circuit, 58% of defendants convicted of fraud crimes eligible for non-prison sentences received non-prison sentences).

months.[22] In the Fourth Circuit, such defendants receive a mean sentence of 37.4 months and a median sentence of 25 months.[23] In the Eastern District of North Carolina, the mean sentence for fraud charges is 35.8 months and the median is 27 months.[24]

At first blush, the most compelling data points are those from the Eastern District of North Carolina, as that is where White would be sentenced, if convicted. But the sample size from the Eastern District is also very small and contains only 61 defendants, a sample size in which a tiny number of defendants could dramatically skew the results. Accordingly, we find it wise to also consider data from the circuit and national level. We further find the median sentencing data more applicable than the mean, as the mean sentence factors in individuals with far higher criminal history categories than is warranted for White because it will include recidivists, and the government has not suggested, as one would expect were it true, that White is a recidivist, whereas the median provides some buffer from that distortion. Thus, although we cannot determine White's likely sentence with certainty, a number within the range created by the medians, 18-27 months, is most appropriate.

Assuming that White received a sentence of between 18-27 months for her fraud counts, the government has suggested no

---

[22]*Id.* at 10. Other U.S. Sentencing Commission Data offers slightly different statistics. *See* U.S. Sentencing Commission, 2009 Datafile, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category*, http://www.ussc.gov/annrpt/2009/table14.pdf (providing data that defendants with criminal history category I receive a mean sentence of 30.4 months and a median sentence of 20 months and that defendants of all criminal history categories receive a mean sentence of 33.2 months, and a median sentence of 24 months).

[23]*See* Sentencing Commission Statistics, *supra* note 18, at 10.

[24]U.S. Sentencing Commission, Eastern District of North Carolina Fiscal Year 2009 Guideline Sentences, *Sentencing Information by Primary Offense*, http://www.ussc.gov/annrpt/2009/nce09.pdf.

reasons why the sentences for these first four counts would not likely run concurrently. Further, as mentioned above, if convicted of Counts V and VI, White would likely receive concurrent sentences of 24 months imprisonment for each count, the statutory minimum sentences for aggravated identity theft. Her sentence for Counts V and VI would run consecutively to her sentence for Counts I-IV, 18 U.S.C. §§ 1028A(b)(2) & (b)(4), for a total sentence of approximately 42-51 months.

Likely sentence aside, we note that our entire analysis presumes that White will be found guilty. Of course, this assumption belies our judicial system's fundamental and critical presumption of innocence. Flouting such a seminal aspect of our law is particularly troubling considering that the government must show that important government interests are at stake in prosecuting White, and they must show it via clear and convincing evidence. Our assumption, although necessary to proceed with this analysis, is particularly unsettling in light of our recent precedent in *Evans*, where we permitted the forcible medication of Evans, a schizophrenic, for the purpose of standing trial, *United States v. Evans*, No. 06-4480, 2006 WL 2604843 at *1 (4th Cir. Sept. 12, 2006), and separate juries of Evans's peers found him not guilty of threatening to kill a federal judge and of assault on a federal employee. Judgment of Acquittal, at 1, *United States v. Evans*, No. 1:07CR00043 (W.D. Va. Nov. 15, 2007). Thus, although we have estimated White's likely sentence to be 42-51 months, there is some possibility that she would be found not guilty and that the entirety of her pre-trial detention will remain uncredited time.

c.

Because White, if convicted, is highly unlikely to be sentenced to more than approximately 42-51 months, and because she will be deemed to have served 57.7 months before the government could even begin to prosecute her,

White has certainly "already been confined for a significant amount of time (for which [s]he would receive credit toward any sentence ultimately imposed, *see* 18 U.S.C. § 3585(b))." *Sell*, 539 U.S. at 180. By the time the government would actually begin prosecuting White, her pretrial detention (taking account of likely good time credits) will have extended *considerably longer* than her likely sentence. Although we have not yet defined that amount or percentage of time served that we require for a defendant to satisfy the "significant" standard discussed in *Sell*, it is self-evident that White's case would meet any standard. She will have been in pre-trial detention for the entirety of her likely sentence, a period that clearly exceeds "significant amount."[25]

---

[25]Of course, White could also face supervised release, if convicted. 18 U.S.C. § 3583(a) ("The court, in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment"). Courts determine the authorized terms of supervised release based on the maximum sentence for each crime. For example, for Class C or D felony, a term of supervised release is "at least two years but not more than three years[.]" *Id*. § 3583(b)(2). Here, White faces a maximum statutory penalty of five years imprisonment on Count I, ten years each for Counts II, III, and IV, and two years for Counts V and VI. Thus, Counts I, V and VI are Class D felonies, and Counts II, III, and IV are Class C felonies, 18 U.S.C. § 3559(A). Both Class C and Class D felonies subject White, if she is convicted, to a sentence of between 24 and 36 months of supervised release. 18 U.S.C. § 3583(b)(2).

In *Bush*, we noted that the government's interest in prosecuting a mentally incompetent individual was not defeated when the defendant spent sufficient time in pretrial custody to significantly cover any reasonably anticipated prison sentence because "a conviction may subject Bush to a period of supervised release, *see* 18 U.S.C. § 3583, which would help ensure that she is not released into the public without appropriate monitoring." 585 F.3d at 815. We do not discern that the possibility of supervised release is sufficient to trump the special circumstances in this case. As we have mentioned, in both *Evans* and in *Bush*, the defendants were charged with threatening to kill a federal judge. Although the crimes in this case are certainly serious, they are not of the sort at issue in our precedents. Obviously, if White should commit an offense in the future, she may be prosecuted, whether or not she is on supervised release. White's family and friends, and the wide array of governmental and private human services agencies, not only the criminal justice agencies of government, can and ought to be counted on to address her needs.

In sum, White has clearly served more than a "significant" amount of time in light of her likely sentence. And although "this fact alone 'does not defeat [the government's interest]'" *Bush*, 585 F.3d at 815 (citing *Evans*, 404 F.3d at 239), it substantially lessens the significance of the government's interest in prosecuting White. The government's interest is even further decreased by the nature of White's crime, the lack of public safety concerns, and the lack of information available about White's medical condition, each of which we now consider.

2.

Not every serious crime is equally serious. The nature of White's crimes lessens the government's interest in prosecuting her because her alleged crimes were non-violent offenses. Assuming her guilt, White's crimes did not physically harm any individuals. Further, there is absolutely no evidence in the record that White is capable of or likely to commit future crimes of physical violence. Her doctors at FMCC testified that White is not a danger to herself or to others and does not meet the requirements for civil commitment.

Prosecuting White for her alleged crimes would also fail to provide her alleged victims with any conceivable benefit. The action would not make whole the victims of her alleged conspiracy to commit credit card fraud, credit card fraud, and aggravated identity theft. These alleged victims, Costco, Home Depot, and Zales Jewelers, will not likely receive any restitution from White regardless of whether she is prosecuted.[26] Further, the alleged victims would not receive assurances that White will be detained for any length of time from a possible prosecution, since even if White is tried and convicted, she will likely be released on time served.

---

[26]White's co-defendant was ordered to pay restitution in full.

The non-violent nature of White's crimes principally distinguishes this case from *Bush* and *Evans*. Both Evans and Bush were charged with violent crimes: Evans for allegedly assaulting a United States agricultural employee and allegedly threatening to murder a federal judge, *Evans*, 404 F.3d at 232, and Bush for allegedly threatening a federal judge. *Bush*, 585 F.3d at 806. Moreover, in *Evans* and *Bush*, there was a compelling safety concern inherent in the prosecution since it could help safeguard the defendant's alleged victims. Neither concern exists here, and therefore, the government's interest in prosecuting White is further diminished.

3.

Public safety concerns in this case are significantly diminished and also mitigate the government's interest in prosecuting White. Not only were White's alleged activities non-violent, as discussed above, but her commitment in the prison mental hospital forever limits her from certain activities, such as her ability to obtain and own firearms. *See* 18 U.S.C. § 922(g)(4) ("It shall be unlawful for any person— . . . (4) who has been adjudicated as a mental defective or who has been committed to a mental institution; . . . . [to] possess in or affecting commerce, any firearm or ammunition . . .").[27] Thus a conviction is unnecessary insofar as it would safeguard the public from any possible acts of gun violence from her. White will never be permitted lawfully to purchase a gun, regardless of whether she is convicted.

---

[27]The phrase "adjudicated as a mental defective" is satisfied by a court determination that an individual lacks the mental capacity to contract or manage her own affairs. 27 C.F.R. § 478.11. White meets the standard because the district court found her "mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceeding against her or to assist properly in her defense" pursuant to 18 U.S.C. § 4241(d)(1). *Order* at 1, No. 5:08-CR-00081 (E.D.N.C. June 22, 2009).

White's inability lawfully to obtain a firearm is notable because that very issue weighed heavily on this court in *Bush*. There, the court found that government prosecution was justified in order to limit some of Bush's subsequent activities, and the only activity explicitly mentioned by the court was "her ability to obtain and own firearms." *Bush*, 585 F.3d at 806, *see* 18 U.S.C. § 922(g)(4). The court's exclusive focus on gun ownership indicates its intense concern about that issue. The concern was well-founded in that case, of course, as Bush was charged with threatening a federal judge. But those concerns are inapposite here, as White lacks both violent tendencies and, due to her commitment, the ability to lawfully purchase or possess a gun. Thus, unlike in *Bush*, the public safety issue does not factor heavily into the government's interest in prosecuting White.

4.

White's unique medical condition lessens the government's interest in prosecution because the proposed medical treatment has rarely, if ever, been tested on individuals with White's condition and thus may not rehabilitate White such that she enjoys the benefit of a fair trial.[28] *Sell*, 539 U.S. at 180 ("[T]he Government has a concomitant interest in assuring a defendant a fair trial."). As this court explained in *Bush*, "the common wisdom in the psychiatric community is that delusional disorders rarely respond to medication." *Bush*, 585 F.3d at 812. And the facts here impose an additional layer of complication over those presented in *Bush* because White has the grandiose type of delusional disorder, a rare and little-studied derivation of the disease.

---

[28]We need not disturb the district court's factual findings with respect to the other *Sell* factors. *Sell*, 539 U.S. at 181. The unique circumstances presented by this case justify our notice of the open questions surrounding the proposed treatment plan for a woman with White's unique diagnosis, as those questions bear on the issue whether the government has proved that important governmental interests are at stake notwithstanding the existing special circumstances of White's case.

During the *Sell* hearing, Drs. Kempke and Powers both acknowledged that few scientific studies exist of individuals with White's disorder. The only medical research discussed by either doctor was the Herbel Study. Bryon Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder*, J. Am. Acad. Psychiatry L. (2007). The Herbel study was conducted on 22 male subjects with delusional disorders, all of whom received involuntary treatment for their disorders. Of the 22 subjects, 17 of them, or 77%, were restored to some level of competency through the use of antipsychotic medication. *Id.*

Both doctors, however, testified that the Herbel study did not entirely convince them of the effectiveness of antipsychotic drugs on individuals with delusional disorder. We find this testimony revealing. One notable problem with the Herbel study is that only one of its subjects suffered from the same disorder that afflicts White. Of the 22 subjects in the study, 21 had Delusional Disorder, Persecutory Type, while only one subject had White's variety of the disease: Delusional Disorder, Grandiose Type. Also, of the 22 subjects, none of them were female. As men and women often react differently to medications, *e.g.*, Deborah Gesensway, *Reasons for Sex-Specific and Gender-Specific Study of Health Topics*, 135 Annals of Int'l Med. 935-38 (2001), we cannot necessarily assume that the results of this study, inconclusive as they might be, apply to women. Thus, the Herbel study is of limited assistance in determining whether White could reliably be made competent for trial.

Dr. Kempke also relied on her professional experience and expertise when she testified to the effectiveness of forcibly medicating White. But Dr. Kempke's area of expertise is schizophrenia, not delusional disorders. In fact, she has *never* treated a patient with White's disorder. She even conceded in her testimony that she really did not know how White would respond to antipsychotic medications. Thus, although Dr.

Kempke testified that antipsychotic medication would likely be effective with White because it was effective with schizophrenics, there is some ambiguity as to whether a successful treatment for schizophrenia can be imputed to an individual with a delusional disorder.

There is also ambiguity inherent in Dr. Kempke's testimony regarding the potential side effects of the proposed antipsychotic medication. Dr. Kempke testified that the medication was substantially unlikely to cause White to exhibit side effects that would interfere with her ability to assist counsel. But Dr. Kempke's testimony seems to lack important data points because she has never examined White and has little knowledge of White's medical history and thus may not be able to properly anticipate possible side effects of the medication.[29] Without specific and particularized information about how these medications will affect White, there is some risk that side effects could prevent White from benefiting from a fair trial. *Sell*, 539 U.S. at 180.

Overall, there is little evidence about the effectiveness of antipsychotic medication on individuals with Delusional Disorder, Grandiose Type, and even less information about the possible side effects that White might suffer. Thus, the government's interest in assuring a fair trial for White is undercut by the ambiguity involved in medicating an individual with White's particular medical condition.

### 5.

Finally, we are satisfied that the circumstances presented in this case are not sufficiently exceptional to warrant forcible

---

[29]For example, the prescribed medications can adversely affect metabolic rates, leading to an increased risk of diabetes and elevated glucose or lipids. But without information about White's personal or family medical history, it is unclear how Dr. Kempke might discern whether White is predisposed to diabetes and other related diseases.

medication. *See Sell*, 539 U.S. at 180. White is a non-violent detainee who has served more than the entirety of her likely sentence in pre-trial detention, and in onerous conditions at that. The alleged victims of her crimes, which were solely property crimes, would not likely benefit or be made whole in any way by her prosecution. She is neither a danger to herself nor to the public, nor will she ever be able to purchase a gun. She has a rare form of delusional disorder, and there is a dearth of data regarding whether antipsychotic medications, which rarely work on individuals with delusional disorder, would work on a patient like her.

## IV.

If we authorize the government to forcibly medicate White, an all-too-common, non-violent, long-detained defendant, in a case in which several factors strongly militate against forced medication, it would risk making "routine" the kind of drastic resort to forced medication for restoring competency that the Supreme Court gave no hint of approving in *Sell*. To the contrary, we think the Supreme Court intended to pay more than lip service to the imperative of individual liberty in its admonishment that forced medication is constitutionally permissible in "limited circumstances." *Id.* at 169. We decline to start down a path that would essentially permit the government to forcibly medicate any and every defendant deemed incompetent to stand trial, no matter how little public good or benefit will be achieved in doing so.

Accordingly, the order of the district court is

*REVERSED*.

KEENAN, Circuit Judge, concurring:

I write separately to emphasize the constitutional liberty interest at stake and the high proof burden that the government bears when attempting to forcibly medicate a person

accused of serious crimes. In conducting the constitutional analysis mandated by *United States v. Sell*, 539 U.S. 166 (2003), these fundamental considerations are paramount.

Because of the physical violence inherent in forcible medication, the Supreme Court has held that the government bears the burden of demonstrating an "overriding" or "essential" interest to justify such treatment of an accused. *See Riggins v. Nevada*, 504 U.S. 127, 134, 135 (1992). In my view, the government has fallen far short of meeting this burden of proof. I reach this conclusion without attempting to ascertain the sentence that White may receive if eventually convicted of these crimes.

As the majority opinion states, White possesses a "significant liberty interest" in avoiding the unwanted administration of antipsychotic drugs. That liberty interest protects her mental, as well as physical, integrity. *See Washington v. Harper*, 494 U.S. 210, 229 (1990). Antipsychotic drugs, however, expressly are designed to alter the mind. *See id.* at 228. Such drugs reset the brain's chemical balance, and affect the way a person perceives and interacts with the world. *Id.* at 229. Although the intended effect is therapeutic, these drugs can cause serious and sometimes irreversible side effects. *Id.*

In addition, the forcible administration of drugs necessarily requires a substantial and degrading intrusion of the body. Here, the government proposes to have five medical personnel immobilize the defendant, inject her with a drug that she has not consented to take, and then repeat this procedure about every two weeks, from the time that her appeals in this case conclude through the end of her trial.

I accept the district court's finding that this forced regimen is the least intrusive way to restore White to competence. However, the district court's finding is of no moment unless fully supported by the *Sell* analysis.

Addressing the first factor in the *Sell* analysis, I agree that this court's decision in *Evans* mandates a conclusion that the government has charged White with "serious" crimes. *See United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005). Thus, under *Sell*, the government has demonstrated an "important interest" in restoring White to competence to face trial on those charges. *See Sell*, 539 U.S. at 180.

The prospect of a 10-year sentence, however, is not a *de facto* license to forcibly medicate a defendant in the manner described above, and neither the Supreme Court nor this court has held otherwise. Here, although the government has shown an "important interest" in prosecuting White, the government also must demonstrate that "special circumstances" do not so diminish this interest, rendering forced medication impermissible. *See Sell*, 538 U.S. at 180; *Evans*, 404 F.3d at 235. I conclude that the government has failed to satisfy this aspect of its proof burden.

In *Sell*, the Supreme Court articulated a nonexclusive list of "special circumstances," including the need for timely prosecution and the possibility that a defendant has "already been confined for a significant amount of time for which [s]he would receive credit toward any sentence ultimately imposed." 539 U.S. at 180 (parentheses omitted). The stated considerations guide but do not constrain the assessment of "special circumstances" in a particular case. *See id.*; *Evans*, 404 F.3d at 239.

There is no precise formula to predict the sentence that White might receive if she is convicted of all or some of the crimes charged. The treatment of her codefendant, Vonda Baker, is informative on this point, but is not dispositive of White's potential sentence as recognized by both the majority and the dissenting opinions. However, as of August 2010, White had been in custody for a significant period of time, about 41 months, and it is undisputed that she would receive

credit in calculating her sentence for this period of incarceration and for "good time."

Additionally, our conclusion that the conduct alleged here is "serious" does not preclude us from considering the nature of the offenses in assessing whether "special circumstances" diminish the government's interest in prosecuting White. In fact, the dissenting opinion highlights the extensive range of property crimes that would be considered "serious" under our precedent, from conduct like that alleged here to multi-billion-dollar ponzi schemes. Over this spectrum of "serious" crimes against property, a multitude of offenses would more strongly justify forcible medication than the offenses at issue here.

As the Supreme Court indicated in *Sell*, forcible medication is justified only in exceptional cases. 539 U.S. at 180. I agree with the majority that this is not an exceptional case, but rather comes "perilously close to a forcible medication regime best described . . . as routine." White has already been detained for more than three years even though she is presumed innocent of the charged offenses. The alleged crimes are serious, but entirely nonviolent, and the parties agree that White is not a danger to herself or to others. Thus, the government has failed to prove that its interests are not diminished conclusively by these and the other "special circumstances" discussed above. For these reasons, I join in the majority opinion that forcible medication is impermissible in this case, and that White's constitutional interest in remaining free from the involuntary administration of antipsychotic drugs must be honored.

NIEMEYER, Circuit Judge, dissenting:

Kimberly White stands charged with six felonies involving credit card fraud and aggravated identity theft. After evaluating her mental competence, federal medical experts diagnosed her with Delusional Disorder, Grandiose Type, and deter-

mined that she was incompetent to stand trial. But they also concluded that with medication, White could be restored to competence. Nonetheless, White refused to cooperate and to take any medication.

On the government's motion to medicate White involuntarily, the district court, in an especially careful and thorough review of the circumstances, concluded that White should be involuntarily medicated to restore her competence to stand trial. Faithfully applying the criteria outlined in *Sell v. United States*, 539 U.S. 166, 180-83 (2003), the court found that the government had, by clear and convincing evidence, proved facts satisfying each of *Sell*'s four factors.

If the majority were ever inclined to allow an order for involuntary medication to enable the government to try a defendant, this would be the paradigmatic case. Yet, the majority finds facts based on rank speculation that White will be detained before sentencing longer than she is likely to be sentenced and that she does not threaten the public safety. And then, relying on those facts, it concludes that the government's interest in prosecuting White is so diminished that, as a matter of law, she must now be set free, without facing a trial or the consequences of a potential conviction. The majority also commits errors of law in reaching that conclusion. For example, for purposes of applying *Sell*, it holds erroneously that crimes against property are less serious than crimes against the person and that therefore the government's interest in prosecuting crimes against property is diminished. Yet *Sell* rejects the notion. *See Sell*, 539 U.S. at 180 (noting that government's interest in prosecuting serious crimes applies equally to serious crimes against property and serious crimes against the person); *see also United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005) (holding that the seriousness of a crime for purposes of applying *Sell* is determined by "the maximum penalty authorized by statute").

I conclude that the strong public interest in trying White in the circumstances of this case should incline us to defer to the

district court's careful factfinding and considered judgment. Accordingly, I would affirm.

I

Kimberly White was charged in March 2008 in a six-count indictment with one count of conspiracy to commit credit card fraud, in violation of 18 U.S.C. § 371 (carrying a maximum sentence of five years' imprisonment); three counts of credit card fraud, in violation of 18 U.S.C. § 1029(a)(2) (each carrying a maximum sentence of ten years' imprisonment); and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (each carrying a mandatory penalty of two years' imprisonment, to run consecutively to any other term of imprisonment imposed).

On White's motion, the district court ordered that White be evaluated to determine her competence to stand trial, and for that purpose, she was committed to the Federal Medical Center in Carswell, Texas ("FMC Carswell") and evaluated by the medical staff. In a report dated June 23, 2008, the staff stated that they had diagnosed White with Delusional Disorder, Grandiose Type, and concluded that she was not competent to stand trial. In light of this report, the district court ordered that White be evaluated to determine whether there was a substantial probability that she would regain competence, pursuant to 18 U.S.C. § 4241(d).

After evaluating White, the medical staff at FMC Carswell submitted a second report, dated December 5, 2008, that summarized the forensic evaluation of the medical staff, particularly that of Dr. Leslie Powers, a forensic psychologist, and Dr. Robert Gregg, the chief psychologist, and concluded that there was a substantial probability that White could be restored to competence with antipsychotic medication. The report stated that White had consistently refused to cooperate with the staff conducting the evaluation—she refused to answer questions regarding her auditory or visual hallucina-

tions and refused to consider taking any antipsychotic medications. The report noted that White's delusional disorder was characterized by her belief that she had discovered the cure for AIDS and breast cancer and that she could create this cure from her food and drink. This belief caused her to hoard her food in her cell and to refuse to leave her cell for fear that someone would steal her formula. As a result, White went without bathing for weeks at a time. She was observed writing notes on the walls of her cell regarding her delusions, and, when the staff took away writing implements, she even began to write these notes in her own blood.

Even so, White tended to express her delusions most vigorously when she was being asked to participate in a forensic evaluation or was being questioned about her medical and mental health history. Similarly, her aggressive behavior was most apparent when interacting with authority. The report noted:

> Although a diagnosis of Delusional Disorder, Grandiose Type, has been given in this case, it should be noted that her symptomology is atypical, as she has no history of psychotic symptoms before her arrest and she possesses a remarkable ability to modulate her symptoms in different situations. It is also believed that much of her behavior is contrived and volitional, particularly with regards to her defiance and aggression towards authority.

J.A. 156. In fact, the report described one instance where White had refused to bathe for 21 days, until officials assembled to enter her cell to remove her forcibly, pursuant to a Bureau of Prisons' policy. Just before the team entered her cell, however, she agreed to participate voluntarily and allowed an officer to apply handcuffs so she could be taken to the shower room. According to the report, as White passed her forensic evaluator, she grinned and said, "Good times."

The report concluded that White was not a danger to herself or to others and that the only basis for involuntarily medicating her would be to restore her competence to stand trial, pursuant to *Sell*, 539 U.S. 166. The report rendered the staff's opinion that medication could be prescribed that would restore White to competence and that would be substantially unlikely to have side-effects that would undermine the trial's fairness. The report also concluded that there were no less intrusive alternatives that would successfully treat White's illness.

In response to this report, the government filed a motion to medicate White involuntarily to restore her competence to stand trial and requested a hearing to enable it to present evidence satisfying the *Sell* factors. The court scheduled a hearing to consider the government's motion, and at the hearing the government presented the testimony of Dr. Leslie Powers, a staff forensic psychologist at FMC Carswell who had evaluated White, and Dr. Camille Kempke, the psychiatrist at FMC Carswell treating White. White presented no witnesses at the hearing. Indeed, she elected not to attend it.

Dr. Powers testified to White's diagnosis and the nature of her delusional disorder, indicating that she had observed and evaluated White for over a year. She testified that after diagnosing White with Delusional Disorder, she pursued non-medical treatment options to address the disorder by attempting to get White to participate in competency-restoration counseling classes. White, however, refused to leave her cell to attend the classes. Dr. Powers also testified that she sought to have White voluntarily take medication to treat her disorder but that White also refused to do that.

Dr. Powers indicated that White exhibited no suicidal or homicidal behavior and that she presented no risk to herself or to others. She also indicated that White's health would not be at grave risk without such medication.

Dr. Kempke testified that she agreed with Dr. Powers' diagnosis and assessment that White could not be civilly committed or involuntarily medicated on grounds other than to stand trial, in accordance with *Sell*. Dr. Kempke also stated that White's condition could be successfully treated with antipsychotic medication and explained the treatment plan she would adopt.

She indicated that there were three medications to consider: Haldol Decanoate, Prolixin Decanoate, and Risperdal Consta. Haldol Decanoate and Prolixin Decanoate, she explained, were first-generation drugs, while Risperdal Consta was a second-generation drug. For each of the drugs, Dr. Kempke provided a detailed dosage regimen that she would prescribe for White.

Because Risperdal, which was Dr. Kempke's preferred method of treatment, was not available in short-acting injectable form, Dr. Kempke's first attempt at treatment would be to try to get White voluntarily to take a Risperdal tablet orally to check for allergic reactions. If White consented and had no allergic reaction, an injection of 25 milligrams would be given to White every two weeks. If White refused to take the Risperdal tablet, Dr. Kempke testified that she would use Haldol, beginning with a short-acting dose of 10 milligrams to check for allergy. As long as White showed no allergic reaction, Dr. Kempke would administer Haldol via "a 50 milligram IM every two to four weeks, attempting to go up to four weeks, up to a maximum of 100 milligrams every four weeks." If White had any negative reaction to Haldol, Dr. Kempke would use Prolixin by giving a short-acting injection to check for allergy, followed by an injection of 25 to 50 milligrams every two weeks.

Dr. Kempke also described the possible side effects from the use of each of the medications. Haldol and Prolixin, she pointed out, would carry a risk of muscular problems, including tardive dyskinesia, extrapyramidal symptoms, neuroleptic

malignant syndrome, instability in movement, and agranulo-cytosis. She explained that the second-generation medications, such as Risperdal, have a lower risk of tardive dyskinesia and extrapyramidal symptoms, but present a greater risk of elevated glucose and cholesterol, increasing the risk of diabetes and cardiovascular diseases. But ultimately, Dr. Kempke noted that Risperdal, Haldol, and Prolixin were all considered relatively safe and that they have been used to treat millions of people with major benefits and relatively minor risks of serious side effects.

Dr. Kempke also testified to her proposed management of side effects, stating that they could be "effectively dealt with by treatment strategies or by changing the medication." White would be monitored monthly for abnormal, involuntary movements, and other signs of tardive dyskinesia, and daily for other serious symptoms, and she would have her glucose and cholesterol checked against a baseline every three months. If side effects were to occur, Dr. Kempke explained that they could be counteracted by administering an anticholinergic drug, such as benztropine, or by changing medication or dosage.

Finally, Dr. Kempke gave her opinion that the involuntary medication protocol would be substantially likely to render White competent to stand trial and would be substantially unlikely to give rise to side effects that would interfere significantly with her ability to assist counsel in conducting a trial defense. She testified that there were no less intrusive methods of treating White and that it was in White's best medical interest to be treated with these medications. Dr. Kempke expected that White would be restored to competence within a couple of weeks after receiving her first long-acting injection of a first-generation drug and within four weeks of her first long-acting injection of a second-generation drug, but that it could take as many as five months for White's competence to be fully restored.

After considering the evidence and the arguments of counsel, the district court granted the government's motion to involuntarily medicate White, finding that the government had proved each of the *Sell* factors by clear and convincing evidence. The court directed, in addition, that all medical personnel treating White first request that she voluntarily take the medication before they administered it involuntarily.

From the district court's order, dated October 9, 2009, White filed this interlocutory appeal.

## II

The governing factors for determining whether the government can involuntarily medicate a defendant to restore her competence to stand trial are not disputed. Under *Sell*, 539 U.S. at 180-81, the government must prove (1) that it has at stake important governmental interests; (2) that involuntary medication will significantly further those interests; (3) that involuntary medication is necessary to further those interests; and (4) that administration of the drugs is medically appropriate. And we have held that the government must satisfy these requirements by clear and convincing evidence. *United States v. Bush*, 585 F.3d 806, 814 (4th Cir. 2009).

With respect to the first factor—whether important governmental interests are at stake—the *Sell* Court has observed that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180. And to determine what constitutes a serious crime, we have concluded that a court should "focus on the maximum penalty authorized by statute." *Evans*, 404 F.3d at 237.

Even when a defendant is charged with a "serious crime," creating an "important governmental interest," "[s]pecial circumstances" may lessen the importance of that interest. *See Sell*, 539 U.S. at 180. These "[s]pecial circumstances include (1) the possibility that the defendant might be confined to an

institution for the mentally ill, thus 'diminish[ing] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime'; (2) the potential for future confinement should the defendant regain competence; and (3) the fact that 'the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed).'" *Bush*, 585 F.3d at 815 (alteration in original) (quoting *Sell*, 539 U.S. at 180).

The mere fact that a defendant has already spent a significant amount of time in custody, however, does not alone defeat the government's interest, as other aspects of a trial and conviction may be sufficient to keep the government's interest in the prosecution high. These interests include the message a prosecution sends to the public about the seriousness of an offense, the potential for a period of supervised release following conviction, and the restrictions on firearm ownership and other civil rights that follow from a conviction. *Bush*, 585 F.3d at 815.

The majority has relied on the first *Sell* factor, particularly the circumstances that mitigate it, effectively to order White released without a trial. The majority gives virtually determinative weight to its findings that White, upon completion of litigation, will have been detained for 57.7 months and that the sentence White will likely receive, if convicted, is the "relatively light sentence" of 42-51 months' imprisonment. It thus concludes that White's "pretrial detention (taking account of likely good time credits) will have extended *considerably longer* than her likely sentence," *ante* at 28, which "substantially lessens the significance of the government's interest in prosecuting White," *ante* at 29. But the majority's findings to support these conclusions bubble with speculation of the grandest type.

Beginning with the majority's speculation about White's potential sentence if White were convicted, the majority conducts its own sentencing proceeding, but without the benefit

of a presentence report and the facts necessary to conduct such a proceeding. In a proper sentencing proceeding, the sentencing judge would be required to consider a presentence report which would define the relevant conduct and reveal White's criminal history, which is unknown to the majority. The report would also provide for consideration by the sentencing court the particulars of White's role in the offense and the losses she caused her victims. The government could then introduce evidence that would justify an enhancement of White's sentence, such as egregiousness and aggressiveness in the offense conduct. And the government could even introduce evidence of criminal conduct not charged in the indictment as a basis for enhancing White's sentence within the statutory maximum. *See United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir. 2009). Not only does the majority not have access to these factual matters necessary for sentencing, it does not even purport to apply the Sentencing Guidelines or the factors required for consideration by 18 U.S.C. § 3553. Rather, to predict White's sentence, it looks to the sentence of White's differently situated co-conspirator, Vonda Machelle Baker, and to national statistics issued about fraud convictions generally. This approach is unprecedented and unsupportable.

First, Baker's circumstances are so dissimilar from White's as to provide little or no support for the majority's use of them. Baker was only charged with two counts (including only one count of aggravated identity theft with a mandatory consecutive two-year sentence), whereas White was charged with six (including two counts with mandatory consecutive two-year sentences).* In addition, Baker was repentant, voluntarily entered into a guilty plea, and provided substantial assistance to the government, for which she obtained a downward adjustment in the Sentencing Guidelines' calculation. There is also no basis from which to conclude that White and

---

*The majority misstates the record in assuming that Baker pleaded guilty to three counts, including two counts of aggravated identity theft, and that her relevant conduct was substantially the same as White's.

Baker have similar criminal histories. And, in considering Baker's sentence, the majority overlooks significant aspects of Baker's sentence other than her time of detention. In addition to serving a term in prison, Baker was sentenced to three years' supervised release and ordered to pay over $36,000 in restitution to her victims. Under the majority's outcome, however, White would be relieved of both of these consequences.

The majority also relied on statistics for fraud convictions obtained across the country for all types of fraud crimes, which it then intuitively adjusted. Based on unexamined and general data, it observes that there is "between a 1-in-4 and 1-in-5 chance that White would receive little or no sentence for the fraud counts"—a conclusion that is undermined by consideration of even Baker's lenient sentence for the types of fraud charged in this case. *Ante* at 25. The majority thus concludes that White "would likely receive a relatively short sentence for each count." *Ante* at 25. The majority then takes the national median sentence for fraud generally to assume that White would receive a sentence of 18 to 27 months' imprisonment—"although we cannot determine White's likely sentence with certainty, a number within the range created by the medians, 18-27 months, is most appropriate." *Ante* at 26. It then concludes that the sentences for White's four counts of fraud should run concurrently, again without any support. *Ante* at 26-27.

With respect to White's two counts of aggravated identity theft, each of which requires a mandatory 24-month consecutive sentence, *see* 18 U.S.C. § 1028A, the majority adds to White's predicted sentence only one consecutive sentence for one count of aggravated identity theft, ignoring the other count. With this one consecutive sentence it reaches its prediction of 42-51 months' imprisonment.

The majority's process for predicting White's sentence is not only unsupportable, it is totally without legal support. Courts of Appeals cannot conduct sentencings, and a sentenc-

ing by any court cannot be based on national averages for the broad class of fraud convictions. The governing statutes set forth specific sentences and sentencing ranges, and cases applying them provide precise rubrics that are the subject of thousands of our opinions, none of which the majority has followed.

The majority then concludes that the predicted sentence of 42-51 months is exceeded by White's detention, finding that she will be detained 57.7 months. In making this finding, the majority gives White credit for (1) time detained pursuant to state charges; (2) time that White will be litigating this case, including proceedings in the Supreme Court; and (3) good time credits that the majority assumes White will earn. Again, these findings are based on speculation.

In short, the majority creates new standards and a new process without legal support and relies on gross speculation to find that the government's interest in prosecuting White is overcome by the length of White's assumed detention.

In addition to its reliance on White's time of detention, the majority assumes that White poses no risk to the public safety and that, for that reason also, the government's interest is diminished. The majority gives two reasons. First, because White was committed to a mental institution for evaluation in this case, she has been "adjudged" a "mental defective" as used in 18 U.S.C. § 922(g)(4) and, therefore, will never be entitled to possess a firearm. And second, because the crimes of which White is charged are nonviolent, they are less serious and therefore are, by implication, less of a threat to public safety. Neither reason is valid.

While one "adjudged" a "mental defective" may not possess a firearm under § 922(g)(4), neither party has asserted or claimed that the district court's orders that White be evaluated for her competency to stand trial amount to such adjudication, and that point remains to be demonstrated.

But the majority relies more heavily on its assertion that White's crimes were nonviolent, and therefore the public's safety is not at risk if she is not prosecuted. As the majority explains, "Not every serious crime is equally serious. The nature of White's crimes lessens the government's interest in prosecuting her because her alleged crimes were nonviolent offenses." *Ante* at 29. The majority's statement inappropriately assumes, without legal support, that crimes against the person are more serious than crimes against property for applying the *Sell* factors. A given crime against property, however, can be serious or even more serious than a given crime against the person. Enormous harm and distress can be caused by fraud and Ponzi schemes, as can be witnessed on a grand scale in the case of Bernard Madoff in New York. More importantly, *Sell* itself refused to recognize such a distinction. *See Sell*, 539 U.S. at 180. Moreover, the seriousness of a crime for determining the government's interest is determined not by judges' intuitive evaluations but by the maximum sentence established by Congress for the crime. *See Evans*, 404 F.3d at 237.

In its analysis, the majority has not only misapplied the weight and relevance of White's detention, but it has also undervalued the government's interests by failing to recognize the other important ways in which a trial could serve governmental interests. A trial would serve the dual purposes of publicly confronting White with the serious charges against her, thus enabling the government to seek a conviction that would label White as a felon and her conduct as wrongful, and it would serve as a deterrent to others. Also, if the government were able to secure a conviction, White would lose the right to carry firearms as well as other civil rights. A conviction would, moreover, subject White to a period of supervised release, which might be especially important in circumstances such as those presented here, where White's failure to recognize the seriousness of her conduct suggests that she may pose a substantial threat of reoffending if set free. Finally, because of the nature of White's crimes, there are numerous victims

who individually sustained substantial losses. Any conviction of White would mandatorily result in an order of restitution, requiring White to repay the losses she caused. *See* 18 U.S.C. §§ 3556, 3663A(c)(1)(A)(ii).

These circumstances indicate that the majority's reliance on White's period of detention, even if it were possible to predict, is simply too meager a basis on which to rest an order effectively releasing her without a trial. Such a decision leaves the public with substantial risks, not taken into account by the majority, that the criminal justice system would address, inasmuch as a trial and conviction would go a long way toward incapacitating White and preventing her from reoffending, and it allows White to avoid the full punishment for her crimes. Also, if White is released now and it turns out that she has manufactured many of her symptoms of mental incompetence, the public would face yet a higher risk of reoffense because White would not be subject to any supervision.

In short, I respectfully submit that this case presents the paradigmatic case that *Sell* anticipated would appropriately justify involuntary medication to enable a defendant to stand trial. For these reasons, I would affirm the district court's considered judgment.