## UNITED STATES of America

v.

## Brett A. RODMAN.

## Criminal No. 2:06–170.

United States District Court,
D. South Carolina,
Charleston Division.

Aug. 14, 2006.

Mary Gordon Baker, U.S. Attorneys Office, Charleston, SC, for United States of America.

John Robert Haley, Federal Public Defender's Office, Charleston, SC, for Brett A. Rodman.

## ORDER

PATRICK MICHAEL DUFFY, District Judge.

In its Indictment, the Grand Jury charged that on or about December 29 and 30, 2005, in the District of South Carolina, Defendant Brett A. Rodman, willfully and knowingly did threaten to take the life of the President of the United States, George W. Bush, in violation of Title 18, United States Code, Section 871.

On January 20, 2006, United States Magistrate Judge George C. Kosko ordered, at the request of Defendant, that a psychiatric evaluation be performed to determine whether he is competent to stand trial, 18 U.S.C. § 4241, whether he was sane at the time of the alleged offense, 18 U.S.C. § 4242 and Rule 12.2 of the Federal Rules of Criminal Procedure, whether he is in need of treatment, 18 U.S.C. § 4244(a), and whether he suffers from diminished capacity, 18 U.S.C. § 4247(E). On May 23, 2006, Dr. Robert G. Lucking, the staff psychiatrist from the Federal Medical Center in Butner, North Carolina, prepared a report (the "Report") wherein he determined that the Defendant was "not competent to proceed to trial" and that he should be forcibly medicated so as to restore his competency. Defendant contests these determinations and, on June 30, 2006, moved pursuant to Title 18, United States Code Section 4241(a), for a hearing to determine his competency to stand trial. The court, finding that reasonable cause exists to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, granted this motion for a competency hearing. Whether reasonable cause exists under § 4241 is a question left to the discretion of the trial court.

On July 12, 2006, the court conducted a competency hearing. Prior to the date of the hearing, the Competency Restoration Report prepared by Dr. Lucking was filed with the court, pursuant to the provisions of Title 18, United States Code Section 4247(b) and (c). At the hearing, the court considered the Report, and heard the testimony of Dr. Lucking, as well as the testimony of Mr. Rodman. On July 28, 2006, Dr. Lucking submitted to the court an addendum to his forensic evaluation of Mr. Rodman. In this addendum, Dr. Lucking opined that, due to his mental illness, Mr. Rodman was not criminally responsible for his behavior and was suffering from diminished capacity at the time of the alleged offense.

After taking the matter under advisement and for the reasons set forth herein, the court now finds by a preponderance of the evidence that Mr. Rodman is not competent to stand trial. Because the court further finds that the Government's interest in prosecuting Mr. Rodman is not a strong one, the court denies the Government's request that Mr. Rodman be invol-

untarily treated with psychotropic medications in order to restore his competency.

### *FACTUAL BACKGROUND*

Mr. Rodman is a thirty-eight year old single white male from Charleston, South Carolina. He was born in St. Louis, Missouri, the only child to Christine (Biederman) Quevreaux and Frank Rodman. After a normal childhood, Mr. Rodman graduated from public high school in January 1985. He enlisted in the Marines in February 1985, and received an honorable discharge in March 1989. He was stationed in Okinawa, Japan for his entire tour of duty. His highest rank was E4 with a MOS of administrative clerk.

In 1990, Mr. Rodman registered at Tulane University; however, he withdrew because he had not attended any classes due to his partying. He entered the New Orleans VAMC alcohol and drug treatment program in February 1991. After his admission, he was involuntarily committed for psychiatric treatment and released to the custody of his mother after completion of the treatment.

Between 1991 and 1994, he took several semesters worth of college credit from the University of South Carolina in Sumter and the University of South Carolina in Columbia. Between September 1995 and May of 2000, Mr. Rodman attended the College of Charleston where he received a Bachelor of Arts in religious studies and philosophy.

Since 1991, Mr. Rodman has received psychiatric treatment at the Columbia and Charleston VAMC on approximately six occasions. On one such occasion in October 1998, he was arrested by the College of Charleston Police Department allegedly for threatening another student. As a result of this charge, he was committed on an involuntary basis for psychiatric treatment for a three-week period. He was also involuntarily admitted to the Charleston VAMC in 1996. On both occasions he was diagnosed as bipolar disorder and treated with lithium 1800 mg daily and 1500 mg daily, respectively. The discharge for 1998 indicates that he was experiencing paranoid thoughts believing that his computer had been tampered with by the KA fraternity. Both discharge summaries indicate that he was poorly compliant with both outpatient follow up and the prescribed medication.

In March 2003, Mr. Rodman was arrested in New York for threatening communications directed towards several United States Senators. He received a forensic evaluation at MCC New York from August to October 2003, after he requested to represent himself. In January 2004, he pled guilty and was sentenced to time served, approximately six months. A brief review of the medical records from several other mental health inpatient treatments during the period from 1991 to 2003 indicate that Mr. Rodman has been diagnosed at various times with schizophreniform disorder, bipolar disorder, manic with psychotic features, psychotic disorder NOS. There are no documented instances in which Mr. Rodman behaved violently.

In recent years, Mr Rodman has lived at shelters and areas on the street in downtown Charleston. On or around December 30, 2005, two email messages signed "Brett A. Rodman" were sent from the Charleston County Library to the United States Secret Service ("U.S.S.S."). The message read in part, "the commander in thief; George W. Bush Jr. ... you tell that nigger I said; 'If I ever get the chance, you neo-natzi nigger parasite; I will put a bullet right between your eyes, just for the pleasure of watching you bleed'... In fact, I would gladly and without remorse, put a piece of lead, in the faces of all one hundred lying natzi nigger assholes who call

themselves united states senator ... just for the fun of watching their war criminal faces explode like watermelons at a Gallagher concert." The second message read in part, "George Bush needs a bullet in his fucking head. !" The messages also threatened Secretary of State Condoleeza Rice and Attorney General Alberto Gonzalez, by saying "that way I won't have to put a bullet right in their fucking cranium, for the fun of it...." On January 4, 2006, the U.S.S.S. contacted the Charleston police and SLED regarding the threats. The police and the Medical University of South Carolina (MUSC) Mobile Crisis Unit found Mr. Rodman at the Charleston County Library using the internet. Thereafter, Mr. Rodman was admitted on an involuntary basis to the MUSC Institute of Psychiatry.

## DISCUSSION

### Competency to Stand Trial

The Due Process Clause of the Fifth Amendment prohibits courts from trying and convicting mentally incompetent defendants. *Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 384–86, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966); *United States v. Mason,* 52 F.3d 1286 (4th Cir.1995). The test for determining competency is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 403, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); *Walton v. Angelone,* 321 F.3d 442, 459 (4th Cir.2003).

The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists. *Dusky,* 362 U.S. at 403, 80 S.Ct. 788; *Newfield v. United States,* 565 F.2d 203, 206 (2d Cir.1977). The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts. Although the court may consider a defendant's history of psychiatric treatment in making its decision as to his or her competency, awareness of such history does not automatically require a finding of incompetence. "It does not follow that because a person is mentally ill he is not competent to stand trial." *United States v. Adams,* 297 F.Supp. 596, 597 (S.D.N.Y.1969). Neither likelihood of recovery nor dangerousness is to be considered by the district court; if the court finds that the defendant is incompetent, finding that he is not dangerous does not make him any less so. *United States v. Shawar,* 865 F.2d 856 (7th Cir.1989).

At the competency hearing held July 12, 2006, the United States supported its contention that Mr. Rodman is incompetent with the Competency Restoration Report of Dr. Lucking. This psychiatric evaluation was performed by Dr. Lucking, with psychological consultation provided by Angela Walden Weaver, Ph.D., and the collaboration and contribution of the Forensic Team, Correctional, and Mental Health Staff. The Report first summarizes Mr. Rodman's medical history, then describes the psychological testing used to evaluate his competency to stand trial. The Report states that Mr. Rodman's intelligence tested in the above average range. Initially, Dr. Lucking found Mr. Rodman's conversations to be linear, logical, and goal oriented; however, upon further testing and observation, Dr. Lucking found that Mr. Rodman was completely in

the thrall of a complex paranoid delusional system. Mr. Rodman's core belief is that he is being persecuted by an interconnected group of governmental agencies which are engaged in criminal civil rights violations against him as the result of his expression of his unpopular political views. Mr. Rodman claims that he proved that Al Gore actually won the presidential election in 2000 and that the U.S. military conducted voting fraud by stuffing the ballot boxes using absentee ballots. He feels that he is being followed by Government agents, specifically the FBI. He wants to leave the country and go to a country where other American citizens are not allowed to enter, such as Iran. Mr. Rodman claimed that the purpose of the alleged threatening emails was a form of political protest against the civil rights crimes he believes were being committed against him.

In his report, Dr. Lucking determined that Mr. Rodman "possesses an adequate and factual understanding of the charges against him," "has an adequate understanding of the pleas available to him and the consequences of each," "understands the seriousness of his legal difficulty at this time," "understands the roles and functions of the courtroom personnel," and "exhibits a reasonable understanding of the adversarial nature of the courtroom proceedings;" however, Dr. Lucking ultimately determined that Mr. Rodman is not competent to stand trial because he will not be able to assist in his defense. Dr. Lucking explains:

> Mr. Rodman's delusional system is extensive and pervasive. He is likely to incorporate additional individuals into his delusional system when they do not agree with his assessment of his situation or when they do not act in a manner consistent with his expectations.... There are major psychiatric symptoms currently present which would prevent him from working with his attorney to plan a legal strategy. Mr. Rodman's perceptions are significantly distorted by his underlying delusional beliefs; and he is basing decisions and judgments on his delusional beliefs. Mr. Rodman appears to have the ability to engage in a forthright and candid relationship with his attorney based upon his interaction with the primary evaluator. This will be of little value due to his preoccupation with his delusional beliefs to the point where he is unable to interact on reality based issues.... It is also our opinion that Mr. Rodman does not have the capacity to testify adequately in his own behalf if it should be decided that he should do so. In summary, it is the opinion of the Forensic Team that while Mr. Rodman is able to understand the nature and consequences of the proceedings against him, he is *unable,* as a result of his mental illness, to assist properly in his defense.

(Report at 12.)

At the competency hearing, the Government called Dr. Lucking as a witness and entered the Report into evidence. Mr. Rodman's attorney had an opportunity to examine Dr. Lucking and question him with regards to his Report.

In opposition to the evidence presented by the Government, Mr. Rodman, against the wishes of his attorney, testified on his own behalf. Mr. Rodman's testimony was the only evidence of competency offered by Defendant.

▇ After hearing Mr. Rodman's testimony, the court concludes that he is certainly an intelligent man with an accurate understanding of the nature and consequences of a federal criminal proceeding. The court finds, however, that Mr. Rodman's paranoia and delusional beliefs caused by bipolar type schizoaffective disorder are so pervasive and consuming as

to make him incompetent to assist in his own defense. His fixed delusional beliefs are intimately connected with the substance of the case against him and thus his ability to cooperate with counsel and assist in his own defense is currently undermined. He lacks any awareness of his mental illness, and is likely to disregard the advice of his counsel and engage in counterproductive legal strategies, to the detriment of his own interests. The court therefore finds that it is more likely than not that Mr. Rodman is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

■ Because the court finds by a preponderance of the evidence that Mr. Rodman is incompetent to stand trial, the court commits him to the custody of the Attorney General. 18 U.S.C. § 4241. The Attorney General shall hospitalize Mr. Rodman for treatment in a suitable facility for a period of time, not to exceed **forty-five days.**[1] During his hospitalization, the court orders the mental health facility in which Mr. Rodman is hospitalized to analyze two things: (1) whether there is a substantial probability that in the foreseeable future Mr. Rodman will attain the capacity to permit the trial to proceed; and (2) whether Mr. Rodman is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. *See U.S. v. Wheeler,* 744 F.Supp. 633, 637 (E.D.Pa.1990) (holding that, although the clear language of section 4241(d) provides only that the court order the commitment of defendant for the purpose of determining "whether there is a substantial probability that he will attain the capacity to permit the trial to proceed," the court also has authority to order a dangerousness assessment after determining that defendant is incompetent). If, at the end of this forty-five day period, Mr. Rodman's mental condition has not so improved as to permit the trial to proceed, he will be subject to the provisions of section 4246,[2] and the court will proceed accordingly.

1. Under 18 U.S.C. § 4241, the court has the authority to order hospitalization for a reasonable period not to exceed four months. Because Mr. Rodman has already been detained and subject to evaluation for several months, the court finds that forty-five days is a reasonable period in which to make the necessary evaluation.

2. In relevant part, section 4246 provides:
 If the director of a facility in which a person is hospitalized certifies that a person in the custody of the Bureau of Prisons ... who has been committed to the custody of the Attorney General pursuant to section 4241(d) ... is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available,
 he shall transmit the certificate to the clerk of the court for the district in which the person is confined. The clerk shall send a copy of the certificate to the person, and to the attorney for the Government, and, if the person was committed pursuant to section 4241(d), to the clerk of the court that ordered the commitment. The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another. A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section.
 If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of

### Forced Medication to Regain Competency

 The Government asks the court to order that Mr. Rodman be medicated with psychotropic drugs so as to restore his competency to stand trial. To determine whether the government may forcibly medicate a pretrial detainee, the court must balance the interests of the detainee in resisting medication with the competing interests of the government. A pretrial detainee facing the possibility of involuntary administration of medication possesses a significant liberty and privacy interest in avoiding the unwanted administration of drugs under the Due Process Clause of the Fifth Amendment.[3] *Washington v. Harper*, 494 U.S. 210, 222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *United States v. Charters*, 863 F.2d 302, 305 (4th Cir.1988); *United States v. Morgan*, 193 F.3d 252, 260–61 (4th Cir.1999). The Due Process clause allows the government to involuntarily administer medication to a pretrial detainee in order to render him competent to stand trial, but only if the treatment is 1) medically appropriate, 2) substantially unlikely to have side effects that may undermine the fairness of the trial, and 3) necessary to further important trial-related interests of the government. *Sell v. United States*, 539 U.S. 166, 179,

123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). For the court to establish that involuntary medication will significantly further the governmental interests, it must find that the administration of the medication will likely render the defendant competent to stand trial. *Id.* at 181, 123 S.Ct. 2174. The court must accordingly find that the medication is not likely to cause side effects which may interfere with the defendant's ability to assist counsel in creating a defense or otherwise with the fairness of the trial. *Id.* The Supreme Court stressed the necessity of having an important governmental interest at stake and the responsibility of the courts to evaluate the individual facts of each case. *Id.* at 180, 123 S.Ct. 2174.

 When examining the import of the Government's purposes, the court should consider not simply the nature of the crime but facts, such as whether the defendant was already confined at the prison medical center for a long period of time and whether his refusal to accept medication might result in further lengthy confinement. *Sell*, 539 U.S. at 181, 123 S.Ct. 2174. The court must additionally establish that the medication is necessary to further governmental interests, which requires the court to find that there is no

bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until (1) such a State will assume such responsibility; or (2) the person's mental condition is such that his release, or his conditional

release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another; whichever is earlier....

3. The Fourth Circuit has held that detainees retain interests in liberty and privacy under the due process clause of the Fifth Amendment to the constitution. The Fourth and Tenth Circuits are the only courts to recognize formally a detainee's privacy interest. Hollybeth G. Hakes, *Forcible Administration of Antipsychotic Medication to Pretrial Detainees*, 188 A.L.R. Fed. 285 (2003).

less intrusive alternative treatments that will create similar results. *Id.* Further, wherever possible, the court should consider whether an alternative route exists for achieving the medication of a pretrial detainee prior to medicating under *Sell.* For example, the detainee may be medicated if such treatment is found to be necessary to control his dangerous behavior, which may pose a threat to himself or others. 28 C.F.R. § 549.43 (2002). A consideration of alternative grounds is important, and even necessary, to an understanding of the medical and legal issues regarding trial competence. *Sell,* 539 U.S. at 183, 123 S.Ct. 2174. Significantly, the standard for determining whether to forcibly medicate a detainee for the sole purpose of rendering him competent for trial is greater than the standard for medicating a detainee who poses a significant danger to himself or others. *See Harper,* 494 U.S. at 225–26, 110 S.Ct. 1028.

In this instance, the Magistrate Judge only ordered an assessment of Mr. Rodman's competency to stand trial, and insanity at time of commission of alleged offense. Dr. Lucking was not ordered to assess Mr. Rodman's potential dangerousness, or the appropriateness of medicating him because of his dangerousness. Nonetheless, Dr. Lucking, in his Report, summarily found that Mr. Rodman does not meet the requirements for involuntary medication as defined in the Bureau of Prisons administrative guidelines at 28 C.F.R. 549, as, "at this time, Mr. Rodman is not gravely disabled nor is he considered to be an immanent danger to himself or to others." *See* 28 C.F.R. § 549.43. As such, Dr. Lucking only addressed whether the court has authority under *Sell* to order Mr. Rodman to be medicated in order to restore his competency. To this end, Dr. Lucking reports that (1) treatment of Mr.

Rodman with several long-acting antipsychotic medications will likely restore his competency within six months, (2) Mr. Rodman is unlikely to regain competency absent treatment with antipsychotic medications, and (3) any side effects will most likely be slight and treatable. Defendant strongly contests these findings, arguing that the known side effects of the suggested medications—including involuntary movements, parkinsonism, and painful muscle spasms—are likely to interfere with his ability to communicate with counsel, prevent him from rapidly reacting to trial developments, diminish his ability to express emotions, and otherwise prejudice him in the eyes of a jury.

■ After much consideration, the court finds that, regardless of whether medication would make Mr. Rodman competent to stand trial and regardless of any possible side effects of such medication, the Government has not shown that it has a strong interest in pursuing a trial in this case. The court therefore finds that the Government has not proven *Sell's* third prong: that medicating Mr. Rodman would further important trial-related interests. Although prosecuting a defendant for a serious crime is certainly an important governmental interest, *Sell* states that a court "must consider the facts of the individual case in evaluating the government's interest in prosecution" because "[s]pecial circumstances may lessen the importance of that interest." 539 U.S. at 180, 123 S.Ct. 2174.

In this case, the Government's interest is significantly diminished because Defendant has already been confined for almost the entire term to which he would be sentenced under the Sentencing Guidelines if convicted.[4] Accordingly, unless Defen-

**4.** The maximum sentence of imprisonment possible for a violation of 18 U.S.C. § 871 is

dant is so dangerous that an unusually extended prison sentence is appropriate, the governmental interest in separating him from society is unlikely to be served by a future criminal trial. The court notes that if Defendant were to be found not guilty by reason of insanity, the next step would be a dangerousness hearing for civil commitment under § 4246, the same process that would be required if he is not restored to competency within a reasonable time, *see* 18 U.S.C. § 4241(d). If he is found to be a continuing threat to society because of his mental illness, then he is likely to be confined civilly under 18 U.S.C. § 4246, which could result in confinement beyond that permitted under the criminal law, again reducing the governmental interest in confining Defendant under a criminal sentence. Thus, the court considers that the shorter route to the inevitable end would be simply to hold the § 4246 hearing now rather than immediately ordering involuntary medication. *See U.S. v. Morrison*, 415 F.3d 1180, 1183–84 (10th Cir.2005).

Certainly, regardless of confinement there is an important governmental interest in an adjudication regarding guilt. But disposition of the criminal charge against Defendant may well not produce such a result. Not only has Mr. Rodman's counsel asserted an insanity defense, but the Bureau of Prisons report prepared by Dr. Lucking also concluded that he was entitled to an insanity defense. Accordingly, because Defendant has a likely insanity defense, as supported by Dr. Lucking's report, the court finds that the Government's interest in pursuing a trial is not strong enough to outweigh Mr. Rodman's significant liberty and privacy interest in avoiding the unwanted administration of drugs. The court therefore will not order the forcible medication of Mr. Rodman under the standard of *Sell.*

### CONCLUSION

For the reasons as stated above, the court hereby finds that Mr. Brett Rodman is incompetent to stand trial. The court further finds that the Government has not met its burden of proving its important interest in restoring Mr. Rodman's competency so as to justify forcibly medicating him under the *Sell* standard.

Accordingly, the court **ORDERS** that Mr. Rodman be committed to the custody of the Attorney General for hospitalization in a suitable facility pursuant to Title 18 of the United States Code, Section 4241, for a period of time not to exceed forty-five days. The court further **ORDERS** that, within that forty-five day period, a psychological evaluation be performed and a report be provided determining whether Mr. Rodman poses a substantial danger to himself or others.

**AND IT IS SO ORDERED.**

---

five years. Mr. Rodman has been a detainee of the Bureau of Prisons since his arrest on January 4, 2006, over eight months. After reviewing his file and estimating his applica-ble Sentencing Guidelines, the court finds that it is unlikely that Mr. Rodman would be eligible to receive a sentence in excess of eight to sixteen months imprisonment.