Reversed by published opinion. Judge HARRIS wrote the majority opinion, in which Judge WYNN joined. Chief Judge TRAXLER wrote a dissenting opinion.
PAMELA HARRIS, Circuit Judge:
Following his arrest for firing a handgun at a Coast Guard helicopter, appellant John Watson, Jr. (“Watson”), who suffers from Delusional Disorder, Persecutory Type, was found incompetent to stand trial and committed to the custody of the Attorney General for mental health treatment *419 and evaluation. After Watson refused to take antipsychotic medication in order to render himself competent, the district court granted the government’s request that he be medicated by force. Given the critical liberty interests at stake, we require the government to meet a heavy burden to justify forcible medication, and we require courts to conduct a searching inquiry in order to ensure that this burden is met. In this case, we conclude,' the government has not met its burden of proving that involuntary medication is substantially likely to restore Watson’s competency, as required by Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Accordingly, we reverse.
I.
“The forcible injection of medication into a nonconsenting person’s body ... represents a substantial interference with that person’s liberty.” Riggins v. Nevada, 504 U.S. 127, 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (quoting Washington v. Harper, 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)). The interference is “particularly severe” when, as in this case, the medication in question is an antipsy-chotic, Riggins, 504 U.S. at 134, 112 S.Ct. 1810, for the use of such medications threatens an individual’s “mental, as well as physical, integrity,” United States v. White, 620 F.3d 401, 422 (4th Cir.2010) (Keenan, J., concurring). On the physical side, there is the “violence inherent in forcible medication,” id., compounded when it comes to antipsychotics by the possibility of “serious, even fatal, side effects,” Harper, 494 U.S. at 229, 110 S.Ct. 1028. But it is the invasion into a person’s mental state that truly distinguishes anti-psychoties, a class of medications expressly intended “to alter the will and the mind of the subject.” United States v. Bush, 585 F.3d 806, 813 (4th Cir.2009) (quoting Harper, 494 U.S. at 238, 110 S.Ct. 1028 (Stevens, J., concurring in part and dissenting in part)).
For those reasons, as we have recognized, the forcible administration of anti-psychotic medication “constitutes a deprivation of liberty in the most literal and fundamental sense,” Bush, 585 F.3d at 813 (quoting Harper, 494 U.S. at 238,110 S.Ct. 1028 (Stevens, J., concurring in part and dissenting in part)), justified only by a government interest that rises to the level of “essential” or “overriding,” Sell v. United States, 539 U.S. 166, 178-79, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (quoting Rig-gins, 504 U.S. at 134, 135, 112 S.Ct. 1810). The government’s interest in prison safety and security, the Supreme Court held in Harper, qualifies as such an interest, and may justify involuntary medication when an inmate suffering from a “serious mental illness” is “dangerous to himself or others,” and “the treatment is in [his] medical interest.” 494 U.S. at 227, 110 S.Ct. 1028.
Under certain circumstances, a mentally ill defendant who is not dangerous to himself or others within the meaning of Harper may nevertheless be forcibly medicated for the sole purpose of rendering him competent to stand trial. See Sell, 539 U.S. at 179, 123 S.Ct. 2174. But that is the exception, not the rule. Forcible medication is not justified every time an incompetent defendant refuses treatment; on the contrary, “those instances may be rare.” Id. at 180, 123 S.Ct. 2174. As we have emphasized, forcible medication under Sell is “a tool that must not be casually • deployed,” and courts must be vigilant to ensure that such orders, which “carry an unsavory pedigree,” do not become “routine.” United States v. Chatmon, 718 F.3d 369, 373-74 (4th Cir.2013).
To “minimize[ ] the risk of erroneous decisions in this important context,” *420 we have set a deliberately high standard for the government to satisfy before it may forcibly medicate solely to render an inmate competent to stand trial. Bush, 585 F.3d at 814. Like other courts of appeals to consider the issue, we require that the government meet its burden by the “clear and convincing” standard. Id.; see, e.cj., United States v. Dillon, 738 F.3d 284, 292 (D.C.Cir.2013) (“Holding the government ' to a clear and convincing standard of proof affords due regard to the nature of the liberty interest at stake in forced-medication cases.”); United States v. Green, 532 F.3d 538, 545 (6th Cir.2008) (applying clear and convincing standard); United States v. Gomes, 387 F.3d 157, 160 (2d Cir.2004) (same). That is a heavy burden, requiring “evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established,” or “evidence that proves the facts at issue to be highly probable.” United States v. Heyer, 740 F.3d 284, 292 (4th Cir.2014) (quoting Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir.2001)).
In this context, we require that the government prove by clear and convincing evidence each of four factors. “First, the government must show that ‘important governmental interests are at stake’ and that special circumstances do not sufficiently mitigate those interests.” White, 620 F.3d at 410 (quoting Sell, 539 U.S. at 180, 123 S.Ct. 2174). Second, the government must show that “involuntary medication ... significantly further[s] [its] interests,” which requires proof that the medication is “substantially likely to render the defendant competent to stand trial” and “substantially unlikely to have side effects that will interfere significantly with the defendant’s ability to assist counsel at trial.” Id. (quoting Sell, 539 U.S. at 181, 123 S.Ct. 2174) (internal quotation marks omitted). “Third, the involuntary medication must be necessary to further the government’s interests, and less intrusive means must be unlikely to achieve substantially the same results.” Id. (citing Sell, 539 U.S. at 181, 123 S.Ct. 2174). Fourth and finally, “the court must conclude that the administration of drugs is medically appropriate and in the patient’s best medical interests in light of [his] medical condition.” Id. (citing Sell, 539 U.S. at 181,123 S.Ct. 2174). With this demanding standard in mind, we now consider whether the district court properly found that forcible medication is justified in this case. United States v. Watson, No. 1:13-cr-366, 2014 WL 1901256, at *1 (E.D.Va. Apr. 29, 2014).
II.
A.
On September 28, 2012, Watson was observed shooting a handgun at a Coast Guard helicopter flying overhead. The helicopter was not damaged, and none of the three Coast Guard employees on board was injured. On August 15, 2013, Watson was indicted for attempted destruction of an aircraft, 18 U.S.C. § 32(a)(1), (8); possession of a firearm by a felon, 18 U.S.C. § 922(g)(1); and use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A).
Days after Watson’s arrest, the magistrate judge granted the parties’ joint motion for a competency hearing, and Watson was interviewed by licensed clinical psychologist Dr. Rebecca J. Peterson (“Peterson”). Watson told Peterson that he had been a covert operative for the British special forces since he was seven years old, that the Coast Guard and Secret Service were among the government agencies “working to help protect him from danger and ... guide him,” that certain “entities *421 ... ha[d] ‘tapped’ his phones and computer,” and “that someone ha[d] been on his boat going through his letters and papers.” Watson further indicated that this delusional system of beliefs had been guiding his behavior since at least February 2009, when he arrived in the Washington, D.C., area in order to seek the protection of the British Embassy and was referred to St. Elizabeth’s Hospital (“St. Elizabeth’s”) for mental health treatment.
On the basis of this interview, Peterson concluded that Watson was “unable to participate meaningfully and effectively in his defense” as a result of his delusions, and in particular his belief that his status as a covert operative for the United Kingdom entitles him to diplomatic immunity. The magistrate judge agreed, and Watson was transferred to the Federal Medical Center in Butner, North Carolina (“FMC But-ner”) for mental health evaluation and treatment.
Approximately six months later, on April 4, 2013, the government submitted to the court a report completed by FMC Butner staff psychiatrist Dr. Robert G. Lucking (“Lucking”), which recommended that Watson be forcibly medicated in order to render him competent to stand trial. Because the government relies exclusively on Lucking’s opinion to show there is a substantial likelihood that forcible medication would render Watson competent as required by Sell, we review Lucking’s report and testimony in some detail.
In his report, Lucking diagnosed Watson with Delusional Disorder, Persecutory Type,[1] a rare mental illness characterized by “the presence of one or more nonbi-zarre delusions that persist for at least one month.”[2] Lucking further reported that Watson’s delusions had not been treated with antipsychotic medication at FMC Butner, and that Watson had refused to accept such treatment. Lucking believed Watson to be neither gravely disabled nor a danger to himself or other inmates, as would be required to justify forcible medication under Harper. Nevertheless, he recommended that Watson be forcibly medicated with the antipsychotic risperi-done,[3] asserting that “antipsychotic medication is substantially likely to render [Watson] competent to stand trial.”
In support of his opinion, Lucking asserted that “there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with anti-psychotic medication,” and that “a body of evidence” supports the related proposition that such individuals “can be restored to competency when treated with antipsy-chotic medication.” Lucking also asserted that Watson had taken risperidone during his 2009 admission to St. Elizabeth’s, from which Lucking drew the “logical inference *422 [that Watson] responded positively to the use” of that drug. However, Lucking admitted that he did not have the medical records from that admission, and later testified that he would have recommended risperidone even if Watson had never received it before.
Finally, during a hearing on the government’s request for forcible medication, Lucking testified that his past experience as a psychiatrist supported the use of ris-peridone. Lucking asserted that he had treated approximately ten other patients suffering from Delusional Disorder with antipsychotic medication, and that he “believe[d] all of them” had been restored to competency. Lucking was, however, unable to provide any further information about the ten other patients, explaining that he could “not remember details of patients [he] treated maybe five, six, seven, or eight years ago,” and that it would in any event be “inappropriate” to share such “treatment [and] clinical information” in a public forum, “even with the [district court].”
Lucking’s opinion regarding the efficacy of involuntary medication was challenged on several grounds by the report of defense expert and licensed psychologist Dr. James H. Hilkey (“Hilkey”). With respect to the academic literature, Hilkey emphasized that “there is little in the literature referencing well controlled, double-blind research studies as to the efficacy of pharmacological treatment of persons suffering from Delusional Disorders.” He also pointed out that the studies that do exist have consistently shown the Persecutory Type of the disorder — from which Watson suffers — to be the “most resistant” to treatment.
With respect to Watson in particular, Hilkey opined that “[t]he chronic nature of [Watson’s] illness and the fixed, well established nature of his aberrant thoughts” make his condition resistant to treatment, whether pharmacological or psychological. He expressed concern that the involuntary treatment plan did not adequately address Watson’s “strongly held beliefs and reported personal experiences with psychotropic medications,” including “pronounced fears of death,” and opined that “[f]ailure to compassionately address these fears [would] only contribute[ ] to fears of persecution” and thus aggravate his condition. Finally, Hilkey indicated that it was his “strongly held opinion” that supportive and cognitive behavioral therapy would “increase the likelihood [Watson’s] competency could be sufficiently restored,” given Watson’s apparent “capacity to form a degree of therapeutic alliance,” as demonstrated by his trusting relationship with his attorneys.
B.
On March 7, 2014, the magistrate judge recommended that Watson be forcibly medicated in order to restore his competency. Watson, 2014 WL 1901256, at *1, *4. The magistrate judge’s findings with respect to the first two Sell factors are relevant to Watson’s arguments on appeal.
With respect to the first Sell factor, the magistrate judge found “that an important government interest is at stake in the prosecution of the defendant,” rejecting Watson’s argument that that interest was mitigated by “the possibility of an affirmative defense of not guilty by reason of insanity.” Id. at *12, *14-15. In reaching this conclusion, the magistrate judge assumed that such a defense could constitute a mitigating special circumstance, but found that Watson had failed to prove that the defense was “likely [to] be successful” because he had not proffered expert testimony to that effect. Id. at *15.
*423 With respect to the second Sell factor, the magistrate judge found that the proposed treatment plan was substantially likely to restore Watson’s competency. To reach this conclusion, the magistrate judge relied entirely on Lucking’s testimony and report, which, he noted, referenced the academic literature and the experiences of Lucking’s other patients with Delusional Disorder. Id. The magistrate judge held that Hilkey’s forensic evaluation did not “undermine” Lucking’s conclusion, solely on the ground that Hilkey’s report nowhere “directly discredit[ed]” Lucking’s treatment plan. Id. at *16.
On April 29, 2014, the district court issued a brief order adopting the recommendations and findings of the magistrate judge and granting the government’s motion for involuntary medication. Watson, 2014 WL 1901256, at *1, *4. The order has been stayed pending resolution of this appeal. Order, United States v. Watson, No. l:13-cr-366 (E.D.Va. May 27, 2014), EOF No. 76.
III.
On appeal, Watson challenges the district court’s findings with respect to the first and second prongs of Sell. Because we conclude that the district court clearly erred in finding that the government had met its burden under the second prong of Sell — and in particular, its burden of proving, by clear and convincing evidence, that forcible medication is substantially likely to restore Watson to competence[4] — we do not decide whether a possible insanity defense is a special circumstance that may mitigate the government interest in prosecution, or whether the district court otherwise erred in finding that the government met its burden under the first prong of Sell.[5]
A.
We have said that the second Sell factor involves factual determinations subject to clear error review, see White, 620 F.3d at 410, and we recognize that our role is not to second-guess a district court’s factual findings, see United States v. Francis, 686 F.3d 265, 273 (4th Cir. 2012). We are, however, charged with ensuring that the district court actually makes the necessary findings, and that it makes them pursuant to the proper legal standard — that it asks and answers the right questions — in light of the record as a whole. See Jiminez v. Mary Washington Coll., 57 F.3d 369, 379 (4th Cir.1995) (“We reverse a factual finding as being clearly erroneous if, ‘although there is evidence to *424 support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’” (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948))). And in this highly sensitive context, governed by the exacting clear and convincing standard, it is especially important that a district court consider and contend with substantial evidence that would undermine the case for forcible medication, and that it ensure that the government’s burden actually has been met. See id. (clear error may occur when a district court “disregard[s] substantial evidence that would militate a conclusion contrary to that reached” or otherwise reaches a conclusion “contrary to the clear weight of the evidence considered in light of the entire record”). On the basis of our review of the entire record, we conclude that the district court clearly erred in finding that the government had met its burden of proving, by clear and convincing evidence, that the proposed treatment is substantially likely to restore Watson’s competency. We further conclude that on the record before us, that exacting standard cannot be met.
B.
Under the second prong of Sell, the government must prove, by clear and convincing evidence, that involuntary medication significantly furthers its interests. See Chatmon, 718 F.3d at 374. And as part of that showing, the government must “demonstrate that the proposed treatment plan, as applied to this particular defendant, is ‘substantially likely’ to render the defendant competent to stand triah” United States v. Evans, 404 F.3d 227, 242 (4th Cir.2005) (emphasis in original). Merely showing a proposed treatment to be “generally effective” against the defendant’s medical condition is insufficient to meet this burden. Id. at 241-42; see Bush, 585 F.3d at 816 (“[I]n order to satisfy this second factor of the Sell test, the government must not only show that a treatment plan works on a defendant’s type of mental disease in general, but that it is likely to work on this defendant in particular.”) (emphasis in original); see also United States v. Ruiz-Gaxiola, 623 F.3d 684, 700 (9th Cir.2010) (finding this burden unmet where the government’s “experts rely on generalities and fail to apply their views to [the defendant’s] condition with specificity”). Instead, the government must “relate the proposed treatment plan to the individual defendant’s particular medical condition,” Evans, 404 F.3d at 242, which requires consideration of factors specific to the defendant in question, including not only his medical condition, but also his age and the nature and duration of his delusions, see id. at 241.
What is missing from the proceedings below is any finding assessing the likely success of the government’s proposed treatment plan in relation to Watson’s particular condition and particular circumstances. The district court did find that “[t]he record convincingly reflects that the government has satisfied” the second prong of Sell. Watson, 2014 WL 1901256, at *3. But nothing in the district court’s decision indicates that it actually considered whether the evidence proffered by the government sufficiently addressed Watson’s particular medical situation. Rather, the district court appears to have concluded that the “substantially' likely” requirement had been met merely because Lucking testified that it was. See id. (finding that government had shown involuntary medication to be “substantially likely to render the defendant competent to stand trial” because “Lucking ... testified that the treatment plan he designed for defendant ... satisfies these require *425 ments”). And if we go behind the district court’s order to the magistrate judge’s report and recommendation, the result is no better: In adopting Lucking’s conclusion, the magistrate judge pointed for support only to Lucking’s reliance on the academic literature and his experience with his own patients, see id. at *15, neither of which bears' on Watson’s particular medical condition or circumstances.
It is critical that in evaluating the government’s case for forcible medication under Sell, courts engage in the proper inquiry: not whether a proposed treatment plan is likely to work in general, but whether it is likely to work as applied to a particular defendant. Permitting the government to meet its burden through generalized evidence alone would effectively allow it to prevail in every case involving the same condition or course of treatment. See Evans, 404 F.3d at 241. Because we are obligated to ensure that a given case is “sufficiently exceptional to warrant the extraordinary measure of ■ forcible medication,” we cannot permit such deference here. White, 620 F.3d at 413; see also Evans, 404 F.3d at 241.
C.
In this case, the requirement that the court assess the efficacy of antipsychotics as applied “with specificity” to Watson’s circumstances, Ruiz-Gaxiola, 623 F.3d at 700, is more than a formality. The district court’s failure to look beyond Lucking’s conclusory assertion that the government’s burden had been met is problematic precisely because there is a near total absence of evidence in Lucking’s report or testimony that “relate[s] the proposed treatment plan to [Watson’s] particular medical condition.” Evans, 404 F.3d at 242. This is not a case, in other words, where the district court’s failure to properly synthesize or distill the evidence is harmless because we can see for ourselves that the government has met its burden under the second Sell prong. On the contrary: There is virtually nothing in Lucking’s report or testimony — the entirety of the government’s case — that is sufficiently specific to Watson that it could satisfy the government’s burden of showing that Watson is substantially likely to be rendered competent by forcible medication, let alone meet the rigorous clear and convincing standard.[6]
Lucking, for example, argues that ris-peridone is likely to restore Watson’s competency because “there is extensive support in the psychiatric literature that individuals with the diagnosis of a psychotic illness obtain substantial reduction in their psychotic symptoms when treated with antipsychotic medication.” In other words, he asserts: (1) antipsychotic medication effectively treats psychotic symptoms; (2) Watson has psychotic symptoms; (3) therefore, antipsychotic medication will effectively treat his psychotic symptoms. See also J.A. 75 (Lucking testifying that Watson “has a psychotic symptom; therefore, he needs treatment with an antipsychotic”). This is exactly the kind of nonspecific, syllogistic reasoning we deemed insufficient in Evans, see 404 F.3d at 241, and it has not become any more persuasive over time.
*426 The insubstantiality of that reasoning is exacerbated here by the weaknesses in the studies actually cited in Lucking’s report. For one thing, many of those studies concern the efficacy of antipsychotics in general, rather than risperidone in particular, against psychotic illness in general, rather than Delusional Disorder in particular. Cf White, 620 F.3d at 421 (discounting probative value of doctor’s “professional experience and expertise,” where doctor’s “area of expertise [was] schizophrenia, not delusional disorders”). Because they do not address the specifics of either the proposed treatment plan or Watson’s condition, these studies cannot satisfy the government’s burden of “relating] the proposed treatment plan to the individual defendant’s particular medical condition.” Evans, 404 F.3d at 242.
Moreover, the cited studies that do specifically address Delusional Disorder are equivocal at best. One study, Lucking reports, finds a positive response to medication in fewer than half of the cases reviewed, while another places the positive response rate at less than 15%. Still another study identifies Watson’s particular condition — the Persecutory Type — as having an especially “poor response rate (50% improvement rate with no reported complete recovery).” The one study cited by the government that does unequivocally support the involuntary use of antipsychotic medication to restore the competency of defendants with the Persecutory Type of Delusional Disorder is, by its own terms, vulnerable to “bias[ ] in favor of finding a positive response to treatment” due to its experimental design. Byron L. Herbel & Hans Stelmach, Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder, 35 J. Am. Acad. Psychiatry L. 47, 58 (2007).
This is not to say that these and other studies mentioned in Lucking’s report are of no evidentiary weight at all. They fairly could be understood to provide some evidence that antipsychotic medication may be effective against Delusional Disorder in general. But standing alone, without explanation or analysis applying their findings to Watson as an individual, we do not believe they can provide the requisite clear and convincing proof that the forcible injection of risperidone is substantially likely to succeed in treating Watson’s specific persecutory delusions. Cf. Evans, 404 F.3d at 241-42 (finding government report inadequate to prove that proposed treatment plan was “substantially likely” to restore defendant’s competency where it stated only that “such medication is the ‘primary’ way to treat Schizophrenia” and “nowhere addressed” defendant’s individual concerns).
Lucking’s testimony regarding his past experience treating patients with Delusional Disorder also fails to take account of Watson’s particular condition and circumstances. The experiences of similar patients treated with antipsychotics of course could be relevant to Watson specifically— but here, Lucking was unable to provide any information demonstrating that his patients in fact were similarly situated to Watson. There is, for instance, no evidence that they suffered from the same type of Delusional Disorder, that they received the same medication, that the medication was administered involuntarily, or that their delusions were meaningfully similar in nature and persistence. Indeed, Lucking indicated that he was unable to recall any information about these patients, testifying that he could “not remember details of patients [he] treated maybe five, six, seven, or eight years ago,” and that it would, in any case, be “inappropriate to share other people’s treatment [and] clinical information,” “even with the [dis *427 trict court].” But without information relating his patients’ experiences to Watson’s own circumstances, that data set is just another form of generalized evidence.
Nor do we think this gap can be filled with evidence that is particularized to Watson but goes to an entirely different question: not whether forcible medication is substantially likely to render Watson competent to stand trial, but whether it is substantially unlikely to have side effects that will interfere with his ability to assist counsel. Those are two separate and independent showings, each of which the government must make under Sell’s second prong, 539 U.S. at 181, 123 S.Ct. 2174, by clear and convincing evidence, see Bush, 585 F.3d at 815; one cannot substitute for the other. And as we have held, both showings must be made “with respect to the particular defendant [the government] seeks to medicate involuntarily,” id. at 815-16, with the same “exacting focus on the personal characteristics of the individual defendant and the particular drugs the [g]overnment seeks to administer,” id. at 816 (quoting United States v. Baldovinos, 434 F.3d 233, 240 n. 5 (4th Cir.2006)). In this case, however, while the government does provide an individualized analysis of Watson’s vulnerability to counterproductive side effects from risperidone, that only highlights its failure to provide comparable individualized analysis of the likelihood that risperidone will actually succeed in rendering Watson competent.
Finally, Lucking himself undermines the one section of his report that purports to explain why risperidone was recommended for Watson in particular. In that section, Lucking asserts that risperidone is likely to be effective because Watson was treated with risperidone during his 2009 admission to St. Elizabeth’s. The report itself qualifies this assertion in at least two ways: It admits that Lucking had not reviewed the hospital records from that admission, and also that the mere fact that Watson “was treated and released” by St. Elizabeth’s constitutes only “indirect evidence of a positive response to antipsychotic medication.” More importantly, the assertion was deprived of significance during an April 30, 2013, hearing on the motion for involuntary medication, when Lucking admitted that he would have recommended risperidone even if he learned that Watson had never taken it before. As Lucking made clear, his recommendation rested not on any individualized assessment of Watson, but on the belief that “antipsychoties are the treatment of choice for psychotic symptoms” — the same nonspecific, syllogistic reasoning we have previously rejected. See Evans, 404 F.3d at 241.
D.
We are concerned here not only with the deficiencies in the government’s affirmative case for forcible medication, but also with the substantial questions raised about the government’s proposed treatment plan by Hilkey- — questions never addressed by the magistrate judge or district court. As we have recognized, careful scrutiny by courts of proposed forcible administration of antipsychotics is necessary to minimize the risk of error where such important liberty interests are at stake. See Bush, 585 F.3d at 814. That scrutiny necessarily requires consideration of any substantial and credible evidence that undermines the case for forcible medication. But there is no indication that such consideration occurred here.
The magistrate judge and district court did not examine and then reject the concerns raised by Hilkey in his report, making- subsidiary factual determinations to which we would owe the normal deference. Instead, they summarily disregarded Hil-key’s report in its entirety, solely because *428 Hilkey failed to state expressly that the proposed treatment plan would not succeed. Watson, 2014 WL 1901256, at *3, *16 (“As the Report and Recommendation correctly notes, defendant’s medical expert, Dr. Hilkey, did not state in his report that Dr. Lucking’s plan will not succeed.”). But it is the government’s burden to prove, by clear and convincing evidence, that its proposed treatment plan is “substantially likely to render [Watson] competent to stand trial,” White, 620 F.3d at 410 (quoting Sell, 539 U.S. at 181, 123 S.Ct. 2174), and not Watson’s burden to prove that it is not.
And by perfunctorily disregarding Hil-key’s report, the district court here excluded from consideration significant evidence that does indeed call into question whether forcible medication is likely to “succeed” by restoring Watson’s competency. For example, Hilkey disputes Lueking’s reading of the scientific literature, asserting that “little is known about [Delusional Disorder] compared to other psychotic disorders,” and that what research does exist as to Delusional Disorder indicates- that individuals suffering from the Persecutory Type are “most resistant” to treatment. Hilkey’s objections to the scientific literature on the use of antipsychotic medication to treat Delusional Disorder are particularly concerning in light of Lucking’s heavy reliance on this research in his own report and. the magistrate judge’s second-order reliance on the same research. Yet these concerns are barely acknowledged, let alone adequately addressed, in the district court order.
The decisions below also failed to give adequate consideration to Hilkey’s concern that Watson’s particular persecutory delusions are especially unlikely to respond to treatment. Hilkey opines that: (1) due to “[t]he chronic nature of [Watson’s] illness and the fixed, well established nature of his aberrant thoughts,” Watson’s condition is likely to be- “resistant to change,” and (2) without supportive therapy to address Watson’s “strongly held beliefs and reported personal experiences with psychotropic medications,” which “include pronounced fears of death,” involuntary treatment will “only contribute!] to [Watson’s] fears of persecution.” Those are exactly the kind of individualized concerns that we have said must be addressed by the government in order to meet its burden of proving that the proposed treatment is substantially likely to restore the defendant’s competency, see Evans, 404 F.3d at 241 (finding second-factor burden unmet where government “nowhere addressed [the defense expert’s] concern that Evans’s delusions of governmental conspiracies that ha[d] persisted longer than 40 years [would] resist involuntary medication precisely because the government administers the medication”) — and yet they were summarily dismissed by the district court, see Watson, 2014 WL 1901256, at *2-3, *16.
E.
In sum, the district court in this case did not undertake the searching and individualized assessment of Watson’s likely susceptibility to forcible medication that is required by our case law. It took the government at its word when it argued that the requirements of Sell had been met, without considering whether the government had produced evidence “relating] the proposed treatment plan to the individual defendant’s particular medical condition.” Evans, 404 F.3d at 242. This failure to apply the proper legal standard exacerbated the district court’s apparent failure to consider the concerns raised by Hilkey’s report, which did relate to Watson specifically. See Chatmon, 718 F.3d at 376 (finding clear error where the district court failed to “offer some reason why it *429 did not” credit contrary arguments). Perhaps as a result of these errors of synthesis, the district court overlooked the issue lying at the heart of this case: the meagerness of the evidence that forcible treatment is substantially likely to restore Watson’s competency, when his particular medical situation is taken into account— especially as evaluated under the requisite clear and convincing standard of proof.
Any' one of these problems would raise questions under the clear error standard of review, whether for misapprehension of the relevant legal standard, failure to consider contrary evidence, or reaching a conclusion against the clear weight of the record. See Jiminez, 57 F.3d at 379. In this case, it is enough to say that cumulatively, they leave us with “the definite and firm conviction that a mistake has been committed,” Francis, 686 F.3d at 273 (quoting United States v. Hall, 664 F.3d 456, 462 (4th Cir.2012)), in a context where the costs of error are exceedingly high. We therefore hold that the district court clearly erred in finding that the government has met its burden of proving by clear and convincing evidence — i.e., evidence of a sufficient weight to produce a “firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established,” Heyer, 740 F.3d at 292 — “that the proposed treatment plan, as applied to this particular defendant, is ‘substantially likely’ to render the defendant competent to stand trial,” Evans, 404 F.3d at 242 (emphasis in original).
We further conclude that this is the rare case in which a remand is inappropriate because “the record permits only one resolution of the factual issue”: that this burden cannot be met. PullmanStandard v. Swint, 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); see, e.g., Ruiz-Gaxiola, 623 F.3d at 696 (declining to remand where “[t]here is no explanation that the court could provide on remand and no findings consistent with the record before us that would allow us to conclude that the government has met its burden under the second Sell factor”). In Bush, 585 F.3d at 817, 818, and Evans, 404 F.3d at 242-43, we remanded rather than reversing after finding the record insufficient to support forced medication under Sell. But in those cases, we articulated new legal standards, Bush, 585 F.3d at 817; Evans, 404 F.3d at 241-42, and our remands, at least in part, afforded the parties their first opportunities to present evidence and make arguments under those standards. The standard we apply today, by contrast, was established over ten years ago in Evans, and we believe that the government has had ample opportunity to assemble and defend the evidence necessary to meet it.
Because the government must prove that it has satisfied each of the four Sell prongs before it may forcibly medicate a defendant, we need not reach Watson’s remaining arguments to conclude that the government has not justified forcible medication in this case.
IV.
Accordingly, the order of the district court is

REVERSED.

. The experts in this case use the terms "Per-secutory Type” and "Paranoid Type” interchangeably. For clarity and consistency with - the Diagnostic and Statistical Manual of Mental Disorders, we consistently refer to Watson’s condition as "Persecutory Type.”

. A delusion is "nonbizarre” if it involves a situation that can conceivably occur in real life, such as being followed, poisoned, infected, conspired against — or, as here, being recruited to work as a covert operative for a foreign government. "Bizarre” delusions, by contrast, are clearly implausible, not understandable, and not derived from ordinary life experiences, such as the belief that one's internal organs have been removed and replaced by someone else's organs without leaving a scar or wound.

.The experts in this case use the generic name "risperidone” and the brand name “Risperdal” interchangeably. For clarity, we consistently refer to the drug by the generic name “risperidone.”

. The dissent objects that this issue is not properly before us, and that Watson's argument on appeal is limited to the district court's failure to order that the government provide supportive therapy in addition to forcible medication. We respectfully disagree. While it is true that Watson emphasizes Hilkey's view that medication "must be combined with supportive therapy in order to be successful,” he does so only in support of his ultimate argument: that the only proposed treatment plan actually before the court "will be unsuccessful,” and that “the district court’s finding otherwise is clear error.” Watson Br. 26.

. In the decision below, the district court assumed that a possible insanity defense could be considered in the special circumstances analysis under the first prong of Sell, see Watson, 2014 WL 1901256, at *2, as have other courts within this circuit, see, e.g., United States v. Duncan, 968 F.Supp.2d 753, 765-66 (E.D.Va.2013); United States v. Rodman, 446 F.Supp.2d 487, 496-97 (D.S.C.2006). There is, however, division among the courts of appeals on the question. Compare United States v. Morrison, 415 F.3d 1180, 1186 (10th Cir.2005) (likely insanity defense diminishes government interest in trial), with United States v. Mikulich, 732 F.3d 692, 699-701 (6th Cir.2013) (potential insanity defense does not undermine government interest).

. The dissent takes the position that the only question before us is whether the district court properly synthesized the record evidence, and not whether that evidence supports the district court’s holding. In our view, however, those issues are so closely interrelated in the context of this case that we are justified in addressing them together. As Watson argues on appeal, the district court’s synthesis errors matter precisely because the evidence that the proposed treatment plan will succeed is so thin.